## PEOPLE v. STRYBE et al.

### No. 21,046; March 3, 1894.

#### 36 Pac. 3.

**Accomplice—Corroboration—Instructions.—On** a Murder Trial, the court, on evidence fully authorizing it, submitted to the jury the question as to whether or not a certain witness for the state was an accomplice. The only corroborative evidence was given by the wife of such witness, who testified to certain oral confessions. Held, that it was error to refuse to charge that the testimony of an accomplice ought to be viewed with distrust, and the evidence of the oral admissions of defendants ought to be viewed with caution, under Code of Civil Procedure, section 2061, which directs such instructions to be given "on all proper occasions."

**Accomplice—Corroboration—Instructions.—**It was also Error to refuse to charge that, if the jury found such witness to be an accomplice, and did not believe the evidence of his wife, then there was no corroborating evidence of the accomplice, and it was their duty to acquit.[1]

APPEAL from Superior Court, Sacramento County; Matt. F. Johnson, Judge.

Manuel Strybe and Richard Strybe were jointly convicted of murder, and they appeal. Reversed.

Hiram W. Johnson and Johnson & Johnson for appellants; Frank D. Ryan, district attorney, and W. H. H. Hart, attorney general, for the people.

BELCHER, C.—The defendants were jointly charged by information with the murder of one A. G. Damon, in the county of Sacramento, on the —— day of March, 1888. The information was filed April 15, 1893, and the trial thereafter resulted in a verdict against both defendants of guilty of murder in the second degree, and in a judgment that they be

---

[1] Cited in People v. Buckley, 143 Cal. 391, 77 Pac. 176, where, while approving it, the court says that it and the similar cases—People v. Bonney, 98 Cal. 278, 33 Pac. 351, and People v. Silva, 121 Cal. 668, 54 Pac. 146—"were all cases where the proposed instruction was limited to the language of the statute."

imprisoned in the state prison at Folsom for the term of thirty years. From this judgment, and from an order denying their motion for a new trial, they have appealed.

The theory of the prosecution at the trial was that on the evening of March 6, 1888, Damon went into a disreputable house, known as the "Mobile House," situate at the southeast corner of Second street and the alley between L and M streets, in the city of Sacramento; that defendants were also in the house, and that, with the intent to rob Damon of his money, and with the aid of one Kate Cooper, who was with them, they induced him to drink some whisky, in which they had put a large quantity of morphine, and that the drinking of it caused his death. It was proved that, about 5 o'clock in the afternoon of the day named, Damon went to the Western House and ate his supper, and then went down to the corner of Second and K streets and took a cigar; that after standing there four or five minutes he walked down Second street, and turned into the Mobile House, and that he then appeared to be sober and had in his possession about $200 in money; that a little after 8 o'clock in the same evening he was found groaning and in an unconscious condition, lying on the north side of the alley, about opposite the rear end of the Mobile House, and that he was then removed to the station-house, and shortly thereafter died; that, when found, the only valuables about him were two silver dollars, a pair of spectacles, and a silver or plated watch; that a physician was called to see him at the station-house, who testified that he found him lying in an unconscious condition, breathing heavily, and from his breathing and general appearance suspected poisoning; that in his opinion he was suffering from narcotic poisoning—that is, some poison that produces insensibility, like opium or morphine; that on the next day a post-mortem examination was made by the physician of the county hospital, who testified: "I examined all the principal vital organs. The cause of death was not determined by the autopsy. There was evidence of overfullness of the vessels of the brain. There was some evidence of disease in the lungs. Further than that, the organs were normal. The brain was found to be very much charged with blood. The purpose of the examination was to determine the cause of death. The cause of death was not determined by my report. It is possible that some narcotic drug caused

death. It would be merely a surmise to say that the conditions that I found would lead to that conclusion. There was no positive evidence as to what was the cause of death. I made no examination of the stomach or its contents. . . . . I arrived at no conclusion as to the cause of death.''

To connect the defendants with the commission of the offense charged, the prosecution then called as a witness one Richard Reed, whose testimony, briefly stated, was in substance as follows: He had lived in Sacramento thirteen years, and had known defendants six or seven years, and had been familiar and running with them for a year or more prior to March 6, 1889. Knew Kate Cooper and Mollie Jones, and was familiar with the Mobile House. It was kept by Mollie Jones prior to March 6th, but she was then in jail, and Kate Cooper and Manuel Strybe were then living in it. It had four rooms, the front room opening on Second street, and the rear room having an entrance from the alley. About 5 o'clock on March 6th he went through the alley into the rear room without knocking, as he was accustomed to do, and found the two defendants sitting there at a table. Kate Cooper came in and says: ''We've got a sucker. He's got stuff.'' One of defendants said: ''We are going to have it. Give him some whisky and morphine.'' Dick said: ''Where are we going to get the morphine?'' Manuel said: ''It is in Mollie's bureau drawer.'' Kate said she would get the whisky, and she and Manuel went out, and shortly returned. She poured out two glasses of whisky, and he put in some morphine. She then took a tray, and, with the two glasses of whisky on it, went out of the room, and that was the last the witness saw of her for a day or two. He remained ten or fifteen minutes, and then went away. He met defendants at the corner of Second and K streets between 8 and half-past 8, and said, ''What did you do, boys?'' and one of them spoke up, ''We doped him and drug him out in the alley, and left him.'' A few days later, witness had a conversation with Manuel. ''He came and told me to go down under the cellar, and there was some cash buried there. I was to dig down and find two handkerchiefs. One had about $150 and the other about $100. I went there and made an examination, but I didn't find the money. He told me he went there a few days after, and found a handkerchief that contained the $100. He said the

officers got away with the other." The witness knew that Damon was found in the alley and died, but never told anyone what he knew about the matter until the fall of 1892. Then he had a falling out with defendants, and said: "I told him if he bothered me any more I would kill him." "I told Manuel he must recollect I knew something about the Mobile case. He says: 'Hell! you are as deep in the mire as we are in the mud.' " "The row I had with them was in Green's saloon. I might have said then: 'You son-of-a-bitch, I will fix you.' " "After I had a falling out with them, I met Officer Gibson, and he wanted me to tell him about this matter, and I said 'No,' that I wouldn't say anything about it. Finally, I agreed to tell him, provided I could see the city attorney and the district attorney, so that I could be all right. I did not say a word before they promised that they would not prosecute me. I made an agreement first that I should not be prosecuted."

The only testimony introduced to corroborate the testimony of Reed was that of his wife, Helen Reed. She testified that in March, 1888, she was living with her husband in the Colusa House, in Sacramento, and had three rooms; that she knew the defendants, and remembered the occasion of Damon being found in the alley; that between 7 and 8 o'clock on that night defendants came to her house and asked for her husband, and she told them he was out, but would be in soon, and to come in and sit down; that they remained about ten minutes in the front room, and she was sitting six or eight feet from them in the same room; that they were talking between themselves, and she could hear them; that the first thing said was, Robert asked, "Where is he?" and Manuel replied, "The old stiff is in the alley," and Robert then asked about the money, and Manuel said, "It is all right." On cross-examination the witness testified: "Never had any conversation with my husband about it. Never told him anything about what I overheard. Never asked him what it meant. I knew, when the papers came out, about the killing of Damon. I understood then what it meant. . . . . Never spoke a word to him about it. Lived with him as his wife ever since, continuously to the present time, and have never spoken to him about what I overheard. . . . . I never talked to my husband on this subject at all. I know Mollie Jones. I told her I didn't know any-

thing about this case, and I didn't want to know anything about it. I was talking then. I was not sworn. I tell a person anything. . . . . It never occurred to me that I ought to notify the authorities about what occurred that night. I have never thought of what was said that night in 1888, until I have taken the stand here.''

For the defense, twelve witnesses were called, and testified that they knew the reputation of Richard Reed for truth, honesty and integrity, and that it was bad; and their testimony in this regard was in no way contradicted. It was proved by two police officers that shortly after the death of Damon they separately asked Reed if he knew anything about the matter, and he said he did not. It was also proved that after he had the falling out with the defendants in September, 1892, he said to one witness, speaking of them, ''Those sons-of-bitches, I will have them in jail in twenty-four hours,'' and to another witness he said, ''They were a couple of sons-of-bitches that he was going to do up; that he was going to job them, and if he could not do anything else, he would run them out of town.'' It was further shown that his testimony given at the preliminary examination was in many respects different from and contradictory of that given at the trial.

The defendant Richard was called as a witness in his own behalf, and denied that he was in Sacramento at the time of the alleged murder, or that he had anything to do with it, or knew anything about it, and said that he was in Davisville, Yolo county, at the time named; and in this he was supported by the testimony of his two brothers, Manuel and Stephen. The defendant Manuel was also called as a witness, and denied all the statements made by Reed; and he said: ''Neither I alone, nor my brother and myself, called at Mrs. Reed's or Mr. Reed's house the night of the 6th of March, or had any conversation of any kind in that house then. Never at any time did we have any conversation about carrying a stiff in the alley, or about money. . . . . I was not with Richard Reed that day or evening at all.''

It is earnestly contended for appellants that, looking at all the evidence, a verdict of guilty was clearly not warranted, and also that numerous errors of law were committed by the court in its rulings upon the admission of evidence, which call for a reversal; but we do not deem it necessary to notice these

points particularly. The court, of its own motion, instructed the jury at great length, and, among other things, told them that it was for them to determine whether or not Richard Reed was an accomplice; that to be an accomplice it was not necessary to actually participate in the crime; and that a conviction could not be had on the testimony of an accomplice, unless he was corroborated by other evidence, etc. The defendants asked and the court refused to give the following instructions: ''I instruct you that the testimony of an accomplice ought to be viewed with distrust, and the evidence of the oral admissions of the defendants in this case ought to be viewed with caution.'' ''I instruct you that if you find the witness Richard Reed to be an accomplice, and you do not believe the evidence of the witness Mrs. Richard Reed, then there is no corroborating evidence of the accomplice in this case, and it is your duty to acquit the defendants.'' In view of the testimony, these instructions, we think, should have been given. The first is substantially in the language of section 2061, subdivision 4, of the Code of Civil Procedure, which directs that the jury are to be so ''instructed by the court on all proper occasions''; and in People v. Bonney, 98 Cal. 278, 33 Pac. 98, the refusal to give such an instruction was held to be error. It is objected for the people that this was not a proper occasion for giving the instruction, because it was not proved that Reed was an accomplice; but the court expressly submitted to the jury the question of whether he was an accomplice or not, and the evidence was fully sufficient to authorize such a submission. ''An accomplice is defined to be one who is in some way concerned in the commission of a crime, though not as a principal; and this includes all persons who have been concerned in its commission, whether they are considered, in strict legal propriety, as principals in the first or second degree, or merely as accessories before or after the fact'': Cross v. People, 47 Ill. 152, 95 Am. Dec. 474. The second instruction referred to stated the law correctly, and it was proper, under the circumstances shown, that such an instruction should be asked and given. The judgment and order should be reversed and the cause remanded for a new trial.

We concur: Searls, C.; Haynes, C.

PER CURIAM.—For the reasons given in the foregoing opinion the judgment and order are reversed and the cause remanded for a new trial.