[Crim. No. 1084. In Bank.—May 31, 1904.]

## THE PEOPLE, Respondent, v. WILLIAM BUCKLEY, Appellant.

CRIMINAL LAW — MURDER — SUFFICIENCY OF EVIDENCE — CONFLICT.— Where the defendant was convicted of murder in the first degree, and the testimony for the prosecution is sufficient to sustain the verdict, the fact that there is conflicting evidence for the defense cannot authorize this court to disturb the verdict and the action of the trial court in denying a motion for new trial.

ID.—EVIDENCE—STATEMENT OF DEFENDANT TO POLICE OFFICER—OPINION NOT REPLIED TO.—Where a police officer testified that defendant came to him and made a voluntary statement that one of two strangers informed him that they were going to do up the deceased, who was a non-union man, and that his informant did the shooting, and that the police officer replied, "Your story is absurd in regard to the strangers," to which the defendant made no reply, if the expression of opinion by the police officer was made under such circumstances and conditions that the failure of the accused to reply thereto would in any degree impair his voluntary statement, it was admissible, and, if not, the jury could determine from the statement whether or not it was absurd, and the refusal of the court to strike out the opinion of the police officer was not prejudicial.

ID.— DEPOSITION ON PRELIMINARY EXAMINATION — ABSENCE OF WITNESS FROM STATE.—Where the father of a witness whose deposition was taken on preliminary examination testified that the witness was and had been for two months preceding the trial in the city of Mexico, his testimony, in the absence of contradiction, was sufficient to justify the admission of the deposition in evidence, on the ground that the witness "cannot with due diligence be found within the state."

ID.—TIME OF FILING DEPOSITIONS—DIRECTORY PROVISION—REASONABLE TIME.—The specification of ten days after the close of the preliminary examination, for the filing in longhand ·of the depositions taken thereupon by the official stenographer, is directory merely, and it is sufficient if they are filed within a reasonable time, and before the trial.

ID.—CERTIFICATE OF STENOGRAPHER—PRIMA FACIE EVIDENCE—DICTATION TO TYPEWRITER.—The certificate of the official stenographer to the longhand copy of his notes of the evidence taken at the preliminary examination is *prima facie* evidence of its correctness, and when filed with the county clerk has the effect of a deposition. The personal dictation of his notes to a typewriter, who, under his dictation and in his presence, makes a typewritten copy thereof, which he certifies as correct, is a transcription by the stenographer

within the meaning of the statute; and the fact that he did not personally compare the typewritten copy with his notes does not disprove the correctness of his certificate.

ID.— Proof of Correctness of Certificate — Testimony of Stenographer and Typewriter.—The correctness of the certificate by the official stenographer is sufficiently proved by his testimony that the dictation from his notes to the typewriter was correct, and by the testimony of the typewriter that a correct copy was made of the dictation given. Such testimony is admissible, and is in no respect hearsay.

ID.—Cross-Examination of Defendant—Arrests for Misdemeanors.—Where the plain object of the direct examination of the defendant was to show that he was peaceable and industrious, and had not been accused of crime, or had trouble with the authorities, except in the single case of a small fine for disturbing the peace, it was proper on his cross-examination to show that he had been arrested for other misdemeanors.

ID.— Requested Instructions — Abstract Questions — Request Included in Charge.—It was not error to refuse requested instructions upon abstract questions not bearing upon the case, however correct they may be in law, nor to refuse a correct instruction which is fairly and fully embodied in the charge.

ID.—Requested Instruction as to Verbal Admissions—Matters of Fact.—It was not error to refuse a requested instruction upon the subject of verbal admissions which went beyond the rule of caution prescribed by the code and included matters of fact rendering it erroneous.

ID.—Newly Discovered Evidence—Probable Change of Result—Discretion of Court.—The question as to whether newly discovered evidence is sufficiently strong to render a different result probable is addressed to the sound discretion of the trial court, and its action in relation thereto will not be disturbed, except in cases of manifest abuse.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco and from an order denying a new trial. William P. Lawlor, Judge.

The facts are stated in the opinion of the court.

Robert Ferral, and Frank J. Murphy, for Appellant.

U. S. Webb, Attorney-General, C. N. Post, Assistant Attorney-General, and P. F. Dunne, for Respondent.

ANGELLOTTI, J.—The defendant, William Buckley, was convicted of the crime of murder of the first degree, for the

killing of one George W. Rice, and adjudged to suffer death.

He appeals from such judgment and from an order denying his motion for a new trial.

1. Much of the brief of counsel for defendant is devoted to a discussion of their proposition that the verdict is contrary to the evidence. The record shows no possible basis for holding that the evidence was insufficient to sustain the verdict.

The evidence showed, without conflict, the following facts. The homicide was committed in the city and county of San Francisco on October 11, 1901, at about six o'clock P. M. The deceased was returning from his work. He took a Howard-Street car somewhere in the vicinity of First Street, and rode on the inside thereof to the corner of Howard and Twentieth streets, where he alighted from the rear end.

The defendant and some companions were passengers on the same car, having taken it at the corner of Howard and Second streets, the defendant standing on the left-hand side of the open section in front.

When the deceased alighted he was followed by a man who struck him on the head with a club and beat him to the ground. Another man, who came from near the front of the car, then approached and with a pistol fired three or four shots into the prostrate body of the deceased, inflicting the wounds which caused his death.

The defendant left his place on the car and was on the ground near the deceased before any shot was fired. He fled from the scene of the shooting down Twentieth Street to Shotwell, and east on Shotwell Street, at least one other man running nearly with him, and was overtaken and arrested on Seventeenth Street, about half-way between Folsom and Harrison streets, and nearly half a mile from the corner of Howard and Twentieth streets. He was then pale and perspiring greatly. He was wearing at the time an old gray suit and a soft light hat.

Three witnesses, Walter J. Piatt and his daughter, Erline Piatt, aged fourteen years, both of whom were seated on the left-hand side of the front open section of the car, and Arthur Cleve, a boy of sixteen years, who was standing on the left-hand side of such section, leaning against the body of the

car, positively identified the defendant as the man who fired
the shots.   All the witnesses agree that the man who fired
the shots ran down Twentieth Street towards Shotwell, and
there is testimony that the man who did the clubbing ran in
the same direction.   The deceased in his dying declaration
stated that the man who shot him wore a white hat.   There
was other testimony to the effect that the man who fired the
shots wore a light suit and a light hat, while the man who did
the clubbing wore a dark suit and dark hat; that two men so
attired ran nearly together down Twentieth to Shotwell, to
Nineteenth, and to Folsom, where they separated, the man in
light clothes going east on Folsom to Seventeenth and down
Seventeenth for half a block, where he was arrested, and was
found to be the defendant.

There was also testimony to the effect that when overtaken
defendant was asked by the officers where he was going, and
said that he was endeavoring to catch a Harrison-Street car,
and when asked if he did not know that the car did not run
on Harrison Street west of Fourteenth Street made no reply;
that he was further asked if he had been at the scene of the
shooting, and he replied that he had not, and knew nothing
about it, but had been out to see a friend on Folsom Street.
Having been taken to the police station, he was very shortly
after taken to the hospital for identification by the deceased,
and, on his way there, admitted having been at the shooting,
but denied all participation therein.

Enough has been stated to show the want of foundation
for the contention that the evidence is not sufficient to sup-
port the verdict.

It is true that the defendant testified, substantially in
accordance with the story that he told shortly after his arrest,
that he started out with two or three acquaintances for the
purpose of going out to the Mission to witness some kind of a
fight—a fist fight, he understood; that they were joined at
Howard and Second streets by a couple of strangers whom
he had never before seen; that when they boarded the car
defendant found himself standing on the left-hand side of
the front open section, with one of the strangers, who wore a
black hat, standing on the same side and holding on by the
stanchion at the extreme front; that when they reached How-
ard and Twentieth streets his attention was attracted by the

clubbing, and he alighted and stood "surprised and aston-
ished"; that the stranger who had been standing on the car
with him then commenced to fire the shots at deceased; that
he, after the second shot, frightened because he had been in
this man's company, ran away, the man who had done the
clubbing having already run in the same direction, and that
when he turned into Shotwell Street, he discovered that the
man who had done the shooting was running close behind him,
a foot or two behind; that they ran some distance that way,
to Folsom Street, "or may be Shotwell Street," and that he
never saw this stranger again after they separated.

It is also true that several witnesses to the homicide gave
testimony to the effect that Buckley did not do the shooting,
and that the man who did wore dark clothes and a dark hat,
and that, on his behalf, other circumstances were shown, all
forming the basis for an argument to the jury that the de-
fendant was not guilty. But such an argument can have no
potency in this court. At the most there was simply a con-
flict of evidence on the question as to whether the defendant
was guilty, and, under well-established rules, this court is
powerless to interfere with the verdict of the jury thereon,
and the determination in regard thereto of the trial judge on
the motion for a new trial.

2. According to the testimony of Sergeant of Police Duke,
the defendant on the morning following the homicide in-
formed Duke that he wanted to have a talk with him, and
thereupon, in the presence of others, voluntarily made a state-
ment of what he claimed the facts to be. In this he said,
among other things, that he and his co-defendants, Donnolly
and Moran, started out the afternoon before to see a "scrap"
in the Mission; that before they boarded the street-car at
Second and Howard streets they were joined by two stran-
gers, who went with them; that on the way out one of the
strangers informed defendant that the fellow they were going
to do up was a non-union man; and that this stranger actually
did the shooting.

Duke testified that when defendant had made this state-
ment he said to him, substantially, "Your story is absurd in
regard to the two strangers," and that defendant did not
reply.

Defendant moved to strike out this statement of the wit-

ness as to the absurdity of the story, as irrelevant, immaterial, and impertinent, and the motion was denied.

It is unnecessary to determine whether or not this ruling was erroneous, for it is clear that defendant could not have been prejudiced thereby.

The case was not one of attempting to show accusing and incriminating statements by another in the presence of one accused of crime, who has failed to speak at all, but was simply an expression of his opinion by one to whom the accused person had voluntarily made a statement, as to the reasonableness of one portion of such statement. If such expression of opinion by Duke was made under such circumstances and conditions that the failure of the accused to reply thereto would in any degree impair the force of his previous voluntary statement, it was undoubtedly admissible in evidence.

If it cannot be said that the statement of Duke was such as would naturally call for a reply, it was at most a mere expression of his opinion as to the reasonableness of the statement made by the defendant, which, in view of the fact that the statement so characterized as absurd was before the jury, could not have injured the defendant. The jury could determine from the statement itself whether or not it was "absurd," and it cannot be assumed that in reaching that determination they would be influenced by Duke's opinion in regard thereto.

3. The people were allowed to read in evidence from the transcript of the testimony and proceedings taken and had on the preliminary examination of the defendant the evidence given by Erline Piatt on said examination, upon the ground that said witness could not with due diligence be found within the state, and that her deposition might therefore be read.

It is earnestly claimed that for several reasons the court erred in allowing this testimony to be read in evidence.

There is nothing in the objection that it had not been shown that the witness was not within the jurisdiction of the court, or that it had not been shown that due diligence had been used to have her present at the trial. The Penal Code (sec. 686) provides that the deposition of a witness on the preliminary examination may be read on the trial, "upon its being satisfactorily shown to the court that he is dead or

insane, *or cannot with due diligence be found within the state."*

The uncontradicted evidence of the father of said witness, was, in the absence of any other evidence on the subject, sufficient to justify the trial court in finding that the witness was at the time of the trial, and for two months preceding the trial, in the city of Mexico, republic of Mexico, and therefore could not with due diligence be found within the state of California.

Another ground of objection was, that the transcript of testimony showed upon its face that it was not filed with the county clerk of the county within the time required by law; the statute providing that "The reporter shall, within ten days after the close of such examination (if the defendant be held to answer to the charge), transcribe into longhand writing his said shorthand notes, and certify and file the same with the county clerk," etc. (Pen. Code, sec. 869, subd. 5.) It appears that such transcript was not filed within ten days after the close of the preliminary examination, which was apparently held during the latter part of October, 1901, but it was filed before the trial, which commenced in January, 1902, the certificate of the reporter at the end of the transcript being dated December 16, 1901.

It is settled that the specification as to time contained in the section last quoted from is directory merely, and that if the filing be within a reasonable time it is sufficient. (*People v. Grundell,* 75 Cal. 301. See, also, *People v. Eslabe,* 127 Cal. 243.) As was said in the Grundell case, we are not prepared to say the time in this case was unreasonable.

It was further objected that it was not shown "That the person who signed the certificate at the close of this testimony, to wit: one D. W. Long, is an official stenographer, and the court cannot take judicial notice of" his signature.

In response to this objection, it was shown that the said Long was an official stenographer of the police court, that he was specially appointed and sworn by the committing magistrate to take down the testimony and proceedings on the preliminary examination of defendant, that he did take down such testimony and proceedings, and, a transcription thereof having been thereafter made, that he filed the same with the

clerk of the court, and that he made the signature at the end of the transcript.

The other objections were, that no foundation had been laid for the introduction of the deposition; that it was not shown that the testimony was transcribed by the official stenographer, D. W. Long, into longhand; that the transcript in longhand was not made by Long, and therefore could not be certified by him; and "that it is hearsay,—that is, the transcript being dictated to some one else and taken down."

The foundation for the introduction of the testimony of the witness taken on the preliminary examination was fully laid by the showing that the witness could not with due diligence be found within the state. (Pen. Code, sec. 686.)

Under the provisions of section 869 of the Penal Code, the transcript in longhand of the shorthand notes of the testimony and proceedings, made and certified by the shorthand reporter appointed by the magistrate to take down the same, and who did take down the same, filed with the county clerk, is placed upon the footing of a deposition. (*People* v. *Grundell*, 75 Cal. 301.)

The same section provides that such transcript, "when written out in longhand writing and certified as *being a correct statement of such testimony and proceedings in the case, shall be prima facie a correct statement of such testimony and proceedings.*"

It may be assumed, as contended by the learned counsel for appellant, that this authentication of the deposition by the certificate of the reporter is the sole and exclusive method provided by the statute of proving it; that where there is no certificate, or only one that is materially defective, there is no such deposition as is contemplated by the statute; and that in the absence of such a deposition the testimony of the absent witness cannot be given to the jury. (*People* v. *Morine*, 54 Cal. 575; *People* v. *Gardner*, 98 Cal. 127, 130; *People* v. *Ward*, 105 Cal. 652, 655.)

It does not, however, follow that in this case there was error in admitting the deposition, for it must be assumed, upon the record before us, that the transcript produced was duly certified by the reporter as being a correct statement of the testimony and proceedings.

The certificate is not set forth in the bill of exceptions. It however appears that the people offered the "entire transcript for a limited purpose; that is to say, for the purpose simply of giving character to the entire document, and . . . *the certificate at the end thereof,"* that defendant objected to its admission on the ground that it had not been shown "that the person who signed the certificate at the close of this testimony" is an official stenographer, and that the court ordered the entire transcript admitted for the limited purpose stated by the people. The record thus affirmatively shows that there was some kind of a certificate at the end of the transcript, which, with all other portions of the transcript, except the testimony of the absent witness, has been omitted from the bill of exceptions.

It was at no time specially stated as a ground of objection that there was no certificate, nor was there any objection suggested by the defendant to the effect that the certificate was in any way defective.

Even where the record entirely fails to affirmatively show that the reporter properly certified the transcript of his shorthand notes, but does not show that there was no such certificate, it will be presumed in this court in support of the ruling of the court below, in the absence of specific objection on the ground of want of a proper certificate, that the transcript was properly certified by the reporter. (*People* v. *Reilly,* 106 Cal. 648; *People* v. *Witty,* 138 Cal. 576; *People* v. *Grundell,* 75 Cal. 301, 304.) In *People* v. *Reilly,* the general objection was, as here, that no foundation had been laid for the introduction of the deposition, and it was in effect held that the objection was not sufficiently specific to raise the question as to the certificate. The cases cited by defendant upon this point are not applicable to the question under discussion.

Assuming, then, as we must, that the transcript offered was certified by the reporter, as being a correct statement of the testimony and proceedings, it was under the statute *prima facie* a correct statement of such testimony and proceedings, constituting the depositions of the various witnesses whose testimony was shown therein.

The basis of the remaining objections was the showing made by the testimony of the reporter, in answer to the attack on the deposition made by the defense, to the effect that he did not

personally do the typewriting in the transcription of the notes, except as to a small portion thereof. So far as he did not himself do the typewriting, he dictated his notes to a Miss Grey, who acted as his typewriter, and he then put together the completed work and made the necessary certificate, without, however, having made any comparison for the purpose of verification of the result of the work of the typewriter with his original shorthand notes.

He testified that, so far as he dictated the notes, he dictated fully, faithfully, and literally, and Miss Grey, under objection, testified that she faithfully, fully, and literally transcribed upon the typewriter the dictation as it came to her from Mr. Long. While the statute requires the reporter to "transcribe into longhand writing his shorthand notes," this does not mean that the reporter must with his own hand do the actual writing or typewriting. Such a construction would be unreasonable, and the practice thereby compelled would be not only most burdensome, and in many cases impracticable, but also no more conducive to accuracy than the practice of dictating to another.

The statute undoubtedly contemplates that the work of reproducing in longhand the shorthand notes shall be done under the personal direction and supervision of the reporter who wrote the notes.

There can, however, be no doubt where such a reporter personally dictates from his notes to an assistant, who, under his dictation and in his presence, makes the longhand transcript, that the reporter is himself transcribing his shorthand notes within the meaning and requirement of the statute. He participates in every part of the work, and the fact that he has the assistance of others therein does not make it any the less his transcription. If, therefore, the effect of the certificate annexed to the transcript would be destroyed by a showing that the reporter did not transcribe his notes, the evidence in this case fails to show that he did not so transcribe them.

It is strenuously urged, however, that the facts stated in the certificate were shown to be false by the evidence that the reporter before making the same did not personally compare the transcription with his notes, and that the *prima facie* effect of such certificate was thus destroyed. We are

unable to appreciate the force of this argument.  The certifi-
cate of the reporter provided for by the law (and, as we
have seen, such a certificate must be assumed to have been
attached to the transcript here) is one stating that the tran-
script is "a correct statement of such testimony and pro-
ceedings in the case."  This is the essential fact to be stated
in the certificate, and the failure of the reporter to make a
comparison with his notes of the longhand work done at his
dictation does not show that the statement of the testimony
and proceedings contained in the transcript is incorrect.  The
statute, of course, contemplates that the reporter shall satisfy
himself that it is a correct statement before he makes his
certificate to that effect, but it does not concern itself with
the method by which he shall so satisfy himself.  It simply
provides that when he has certified it as being a correct state-
ment of the testimony and proceedings it is *prima facie* a
correct statement, and the effect of the certificate can be over-
come only by evidence tending to show that it is an incorrect
statement, or, at least, by evidence affording fair grounds for
the conclusion that it is incorrect.  We are speaking, of course,
of a transcript certified by the reporter who in fact officiated
as the reporter at the preliminary examination, and not of
the possible case suggested by appellant, of a certificate made
by one who was not present at the preliminary examination;
for if the certificate be not made by the person designated
by the law, it is necessarily worthless.

The legislature has seen fit to give this effect to the cer-
tificate of the regularly appointed and officiating reporter.

There was no intimation that the statement of the testimony
and proceedings contained in such transcript was incorrect in
any particular.  The transcript was accompanied by a cer-
tificate which, under the express provisions of the law, was a
sufficient authentication, and *prima facie* established its cor-
rectness.  The only possible question, then, in this connection
was as to whether the certificate was true, and not as to
whether it had been made after sufficient investigation by
the reporter; and unless the transcript was incorrect in some
particular, the certificate was true.  If any suspicion that
it might be in any way incorrect was raised by the exposure
that there had been no comparison, the evidence of the re-
porter that he accurately dictated to his typewriter, and the

evidence of his assistant that she fully and literally put into longhand his dictation, was competent, for the purpose of showing that the work of transcription was accurately done, and that the transcript was what the certificate represented it to be, a correct statement of the testimony and proceedings. For these purposes, such testimony was in no sense hearsay testimony, and the case of *People* v. *John,* 137 Cal. 220, which was the simple case of attempting to prove what A said by the testimony of B, who derived his information solely from C, has no possible application.

The statute requires that the original shorthand notes of the reporter shall be filed with the county clerk, and, presumably, they were so filed in this case, and if the defendant had desired to show that the transcript was incorrect, he could have availed himself of these notes for that purpose. If it had been shown that the transcript was not a correct statement of the testimony and proceedings, it might not have been available for use on the trial, but the evidence here presents no such case.

The cases cited by counsel for appellant are in no degree in conflict with our conclusions on this question. They are simply to the effect that every substantial requirement of the law relating to the introduction of the deposition of a witness must be observed, that such a deposition can be introduced only in the cases provided for by section 686 of the Penal Code, that where such a deposition is not authenticated as required by the law it cannot be received in evidence, and that evidence as to what the witness actually testified to cannot be received in lieu of the statutory deposition.

We are satisfied that the court did not err in overruling the objections to the reading in evidence of the deposition of the witness.

4. The defendant was examined as a witness on his own behalf.

On his direct examination, having testified as to his age, his residence in San Francisco during the whole of his life,—viz., twenty-six years,—his family, and his attendance at day-school, and afterwards at night-school, while engaged in work during the day, the following occurred, viz.:—

"Q. Have you ever been before a jury in your life before this?—A. No, sir.

"Q. Ever convicted of any crime at all?—A. No, sir.

"Q. Now, will you kindly tell us, without my friends object—

"A. [Interrupting.] Excuse me, Judge Ferral, if you call disturbing the peace a crime I was fined five dollars one time.

"Q. You were fined once five dollars for disturbing the peace, is that right?—A. Yes, sir.

"Q. How long ago is that?—A. It is about eight or nine years ago, I guess—it is quite a long time ago.

"Q. And that is all your trouble?—A. That is the extent of my conviction of any crime."

On cross-examination the following occurred, viz.:—

"Q. You were asked here about your troubles and you spoke about having been arrested for disturbing the peace some number of years ago—is that the only trouble you had with the police prior to this shooting?—A. I have been arrested, but convicted I never have been.

"Q. How many times have you been arrested?

"Objected to as irrelevant and incompetent and hearsay and not cross-examination and assigned as misconduct.

"*The Court.*—Objection overruled.

"*Mr. Ferral.*—An exception.

"A. I guess two or three times.

"Q. Two or three times—well, what was the trouble the first time?

"Objected to as incompetent, irrelevant, and immaterial, and not proper cross-examination, and assigned as misconduct.

"*The Court.*—The objection is overruled.

"*Mr. Murphy.*—An exception.

"A. The first time?

"*Mr. Dunne.*—Yes.

"A. I think it was driving in a buggy one night. There was some young fellow hired a buggy that I know, and I got into the buggy and he had it out all day and I got in that night and rode an hour with him, and the man that owned the buggy had him arrested and they arrested me with him.

"Q. What was the trouble the second time?

"Objected to as irrelevant, immaterial, and incompetent, and not proper cross-examination, and assigned as misconduct.

"*The Court.*—The objection is overruled.

"An exception was taken.

"A. I don't remember exactly what I did get arrested for—
it was nothing serious, I know—only a misdemeanor, whatever
it was.

"Q. Well, don't you remember what the trouble was?

"Objected to as incompetent, irrelevant, and immaterial,
and not proper cross-examination, and not the best evidence.
The objection was overruled and an exception taken.

"A. I think I was arrested—I don't know—it was battery,
I believe. I don't remember the time exactly. I could not
tell you about the time, or anywhere near the exact time. It
must have been six or seven months before George Rice was
shot."

These rulings of the court on the cross-examination of the
defendant are assigned as error.

It is too well settled to require the citation of authorities
that, upon the trial of one accused of a crime, evidence of other
specific wrongful acts not pertinent to the issue on trial is
not admissible; and, also, that a witness cannot be impeached
by evidence of particular wrongful acts, except that it may
be shown that he has been convicted of a felony.

Most of the many cases cited by learned counsel for defend-
ant go to one or both of these rules, neither of which was
violated by the cross-examination in question.

While under our law a defendant cannot be compelled to
testify, if he does become a witness and testify in his own
behalf, he may be cross-examined "as to all matters about
which he was examined in chief." (Pen. Code, sec. 1323.)
The proper limits of the cross-examination are determined by
the scope of the direct examination, and so long as the cross-
examination is limited to the subject-matter of the direct
examination it is allowable. The cross-examination in question
did not go beyond the matters covered by the direct examina-
tion. The plain object of the direct examination was to show
that the defendant was a peaceable, industrious young man,
who had never before even been accused of crime, and the
effect of the testimony given thereon was, that he never before
had been accused of crime, or had been in any trouble with
the authorities, except in the single case when he was fined five
dollars for disturbing the peace. It would be altogether too
narrow a construction of the direct examination to hold other-
wise. This being the proper construction, the people had the

right on cross-examination to draw out anything which would tend to contradict the evidence adduced on the direct examination, or weaken or modify its effect. (See *People* v. *Gallagher,* 100 Cal. 466, 475.) We cannot say that the cross-examination was not fully justified by the direct examination.

The only California case to which we have been cited that presents the precise question here involved is that of *People* v. *Fong Ching,* 78 Cal. 169, where the defendant was asked on cross-examination if he had ever been arrested before. This court said: "The cross-examination of the defendant was certainly very broad; but as he testified in chief about his birth, parentage, education, and business, we cannot say that he did not open the door wide enough to justify what followed in the cross-examination."

Appellant's counsel suggests that as the question in the Fong Ching case was answered in the negative no harm could have resulted. This court, however, did not put its decision upon the ground of want of injury, but disposed of it in the words above set forth. The direct examination in the case at bar was much broader in its scope than that in the Fong Ching case.

It is urged in appellant's reply brief that the evidence given by defendant on his examination in chief was absolutely irrelevant, incompetent, and immaterial, and that the people had therefore no right to cross-examine him thereon, the claim being that the presumption of the good character of the defendant as to the traits involved in the charge can be supported only by evidence of his general reputation.

It cannot be said that the evidence on direct examination was either irrelevant or immaterial to the issue. While it would be a harsh rule that would forbid the usual practice of allowing one on trial for a crime to testify, if he so desires, that he has led a decent, industrious life and has never before been even accused of crime, for such evidence certainly tends to show good character, still, if it be conceded that that is not the proper way under the rules of evidence to show good character, and such testimony is nevertheless allowed, it is proper subject-matter for cross-examination.

If a defendant does not choose in his direct examination to enter upon matters relating to his previous history, the prosecution cannot commence any inquiry in regard thereto, except

as to the single case of a previous conviction of a felony; but if he voluntarily opens the door to his past and testifies regarding the same for the purpose of showing his good character, he cannot complain of any cross-examination that is limited to the scope of his direct examination thereon.

5. The following instructions were requested by the defendant:—

"11a. It is no offense against the law to go and see a fist fight or what is commonly called a 'scrap,' so long as nothing more than this is done.

"11b. It is not against the law to go and see even a crime committed, so long as there is no participation in its commission,—that is, nothing is done or said to aid or abet in the perpetration.

"11c. Whatever may be said of the propriety of a citizen looking on and not interfering with the commission of a crime committed in his immediate view and presence, yet the law does not make him answerable for so doing.

"11d. In this case if you have a reasonable doubt as to Buckley's saying or doing anything towards causing the death of Mr. Rice, it is your duty to give him the benefit of the doubt."

The court refused to give any of these, and such refusal is assigned as error.

Although there would have been no harm done in giving it, the subject-matter of the fourth of these requested instructions ("11d") was fully and fairly covered by other instructions given by the court. As to the other three, we see no error in the action of the court. It may be that, as mere abstract propositions of law, they are correct, but as mere abstract propositions of law they apparently bear no direct relation to the particular charge contained in the information. The charge here was, that the defendant had willfully, unlawfully, and with malice aforethought killed a human being, and questions as to whether the *law makes it an offense* for one "to go and see a fist fight" or "to go and see even a crime committed" or "to look on and not interfere with the commission of a crime committed in his immediate view and presence," were immaterial. The defendant was not charged with any such offense, but was charged with having willfully and with malice aforethought killed Rice. The theory of the

prosecution was, that he actually fired the shots that caused
the death of Rice, and there was apparently no claim or pre-
tense that he was guilty of the offense charged by reason of
being merely present at the scene of the crime, or unless he
had actually fired the shots.

The jury were fully and correctly instructed as to what
was essential to render the defendant guilty of the offense
charged,—viz., *the murder of Rice;* and probably, if a proper
instruction directly bearing upon the question as to what was
necessary to make defendant a party to the homicide within
the meaning of the law had been requested by him, it would
have been given, notwithstanding the fact that the subject-
matter was fairly covered by other instructions.

6. The following instruction requested by defendant was
refused, viz.:—

"7. With respect to all verbal admissions, it may be ob-
served that they ought to be received with great caution. The
evidence, consisting as it does in the mere repetition of oral
statements, is subject to much imperfection and mistake. The
party himself either being misinformed, or not having clearly
expressed his own meaning, or the witness having misunder-
stood him. It frequently happens, also, that the witness, by
unintentionally altering a few of the expressions really used,
gives an effect to the statement completely at variance with
what the party actually did say."

In this, the court did not err. The question as to the
propriety of giving any requested instruction on the subject
of oral admissions is not here involved. The instruction re-
quested went far beyond the language of subdivision 4 of sec-
tion 2061 of the Code of Civil Procedure, which simply
provides that the jury is to be instructed upon all proper
occasions: "That the testimony of an accomplice ought to
be viewed with distrust, and the evidence of the oral admis-
sions of a party with caution," and was practically the same
instruction held to be erroneous in *Kauffman* v. *Maier,* 94
Cal. 269, 283, as being in violation of the constitutional pro-
vision that "judges shall not charge juries with respect to
matters of fact." There can be no doubt as to the correctness
of that decision. (See, also, *People* v. *Rodley,* 131 Cal. 240,
258.) The cases cited by defendant—viz., *People* v. *Bon-
ney,* 98 Cal. 278; *People* v. *Strybe,* (Cal.) 36 Pac. 3,

and *People* v. *Silva,* 121 Cal. 668—were all cases where the proposed instruction was limited to the language of the statute.

7. One of the grounds of the motion for a new trial was, that new evidence had been discovered material to the defendant and materially in favor of his innocence which he could not with reasonable diligence have discovered and produced at the trial.

It may be conceded that the affidavits show that the newly discovered evidence could not with reasonable diligence have been discovered and produced at the trial.

A new trial should not, however, be granted upon the ground of newly discovered evidence, unless the showing as to such newly discovered evidence is sufficiently strong to render a different result probable.

The question as to whether such a showing is made is one that is addressed to the sound legal discretion of the trial court, and the action of that tribunal in regard thereto will not be disturbed, except in cases of manifest abuse. (See *People* v. *DeMasters,* 109 Cal. 607; *Oberlander* v. *Fixen & Co.,* 129 Cal. 690.)

We have carefully examined the affidavits presented on the motion for new trial, and we cannot say that it is clear that the proposed evidence would render a different result probable. We therefore cannot interfere with the action of the trial court.

The judgment and order are affirmed.

Van Dyke, J., Shaw, J., McFarland, J., and Henshaw, J., concurred.

LORIGAN, J., concurring.—I concur fully in the foregoing opinion of Justice Angellotti, except that I am not disposed to hold that the giving of an instruction as to verbal admissions is violative of the constitutional provision that "judges shall not charge juries with respect to matters of fact." On that point I accord with the declaration in *People* v. *Wardrip,* 141 Cal. 232, (in the opinion by the court on rehearing I did not participate,) that such an instruction "states a mere commonplace within the general knowledge of juries; and we do not think that either the giving or the refusing of such an

instruction would warrant reversal." I think that this sufficiently disposes of such an instruction, and I am not inclined to go further.

BEATTY, C. J., concurring.—I concur in the judgment and in the opinion of Justice Angellotti. With respect to the point adverted to in the concurring opinion of Justice Lorigan, I take this—the first proper occasion—to retract my concurrence in what was said in response to the petition for a rehearing in the case of *People* v. *Wardrip*, 141 Cal. 233. I am satisfied, upon further reflection, that the statute providing that the jury are on all proper occasions to be instructed that the testimony of an accomplice ought to be viewed with distrust, and the evidence of the oral admission of a party with caution, (Code Civ. Proc., sec. 2061,) is not unconstitutional. The power of the legislature to determine what is or is not competent evidence in civil or criminal cases is unquestionable. A law which absolutely disqualified an accomplice, or excluded all evidence of the oral admissions of a party, would be free from any constitutional objection, and if this is so—. if such evidence could be made absolutely incompetent—it seems clearly to follow that its admission may be made subject to any reasonable condition which the legislature may see fit to prescribe. To require the court to instruct the jury on all proper occasions to view the testimony of an accomplice with distrust, or the evidence of oral admissions of a party with caution, is not to charge the jury as to matters of fact, but merely to state the condition upon which the jury is permitted to hear that class of evidence.

I also think that the allowance of these instructions is obligatory in every proper case, and that it is prejudicial error to refuse them when requested by a party against whom such evidence has been given. In this case, however, the instructions requested contained a number of matters in addition to the requirements of the statute, and in the nature of an argument upon the evidence, and were for that reason objectionable.

Rehearing denied.