[Crim. No. 589. Fourth Dist. May 26, 1948.]

THE PEOPLE, Respondent, v. WILLIAM JACK HOUSER, Appellant.

Rae B. Carter and John T. Fuller for Appellant.

Fred N. Howser, Attorney General, and Wm. E. James, Deputy Attorney General, for Respondent.

GRIFFIN, J.—Defendant was charged in an information with three counts of felony, committed on July 4, 1947: Count One, with rape by force; Count Two, statutory rape; and Count Three, with lewd and lascivious conduct upon the body of one Patsy Ann Jeter, 8 years of age. On motion of the People, the first and second counts were dismissed. A trial by jury resulted in a verdict of guilty on the third count. A motion for new trial was denied. The appeal followed.

Patsy Ann was in the third grade at school. She said she knew what it was to tell a lie and that the answers to the questions about to be propounded would be the truth. On the evening of July 4, 1947, she was left in her mother's parked car with her little sister, aged 3, on a street in front of a bank near the "Lindsay Club." The mother went into this club to ask her husband, who was playing cards in the back room, to come home with her. During this waiting period she returned several times to see if the children were all right. She last saw Patsy about 10:30 p. m. Around 11 p. m. a man approached the car and asked if Patsy would "like a pound box of candy." She got out of the car and walked down the street with the man. She said he told her the box of candy was in a near-by orange grove. She went with him. She was barefooted and after they entered the grove for some little

distance Patsy's panties and dress were removed, her body was violated and acts denounced by sections 288a, 261, 287 and 288 of the Penal Code were committed upon her. The man left her in the orchard. She then ran back to the place where the car had been parked. Her parents drove to their home a short distance away, looking for her. On their return they found her near the place where the car had been parked with nothing on except her panties. She immediately told the officers of her experience and described the claimed culprit: "He was bare headed . . . his hair was brownish black, his nose was pointed, his shirt was khaki colored—his pants were kinda bluish and he wore a belt. He had his sleeves rolled up. His clothes looked clean and he smelled like whiskey."

The child was taken immediately to a doctor and examined. According to his report there was substantial evidence of the commission of the acts described.

Defendant makes no contention in this regard, but relies principally on the question of identification and lack of evidence connecting him with the commission of the offense.

Patsy showed the officers where she went with the man into the orchard. Her bare feet tracks were reflected in the dirt as well as the shoe prints of the culprit. A plaster of Paris cast was made of one of the most prominent of the shoe prints.

The next morning the officers took two suspects to Patsy's home for possible identification and they were rejected by her. Defendant was then picked up and taken to her home and identified by her. As to this identification she testified in the justice's court, where defendant was having the preliminary hearing without the aid of counsel: "Q. And when you saw this man you think that (he) did it? A. Yes. . . . Q. And when you think, are you sure this is the man who did it? A. Yes. Q. You are really sure, you are not saying because I suggested, I want you to tell the court the truth, was he, he was the man you thought at that time that done it? A. Yes . . . Q. And as you look at this man now, do you think he is the man who did that to you in the grove? A. Yes. . . . He looks like him. . . . He had a moustache." She later testified at the preliminary hearing in response to a question by the district attorney as to whether "the man who did this to you was in the court?" She replied: "I don't know." The defendant was then pointed out to her and she was asked: "Is this the man," and she said: "I don't know." She testified at the trial that she was not sure at the preliminary but she was sure now and she pointed out the defendant from a group of

men and described the clothes the defendant was wearing on that night as "kind of brown looking pants with a cream-colored shirt"; that she "did not know if he had a moustache . . . It looked dark under his nose"; "he didn't hardly have a moustache . . . he had kind of a few hairs under his nose." She was then shown a shirt and pair of trousers which defendant claimed and other witnesses testified he was wearing that night. She described the shirt as a "blue-white color to her" and the trousers were "green looking." She then stated that she smelled whiskey on the man's breath after she had "walked a ways with him" toward the orchard; that while accomplishing the act the man's trousers were down and he was kneeling on the ground; that thereafter he took her dress and wiped himself with it. Knee prints were discernible to the officers on July 8th, 1947, and they found her dress buried in the dirt near-by, with evidence of human excreta and blood stains upon it.

The officers asked defendant as to his whereabouts the night of July 4th. He stated that he had been drinking quite heavily that day but was not intoxicated; that that evening he had made the rounds of the local bars; that he was in the Lindsay Club and saw men playing poker at one of the tables; that a short time before 11 p. m. he left the club by the rear entrance and went home. He specifically described to them, block by block, and street by street, the exact route he said he took in going home at that time. The officers then took him to his near-by home where he lived with his invalid father and 8-year-old sister. They asked to see the clothes he wore the night before. He had washed them early that morning and they were hanging on the line with other family clothes that he had also washed. He was asked to see the shoes he had worn and he pointed them out to the officers. These shoes had been cleaned and shined that morning. The shoes, a blue sport shirt and a pair of blue-colored pants were taken and are exhibits in the case. The officers repaired to the spot in the orange grove and measured the footprints for size and observed identifying marks between the shoe and the footprints in the dirt. The plaster of Paris cast, the shoes, several samples of soil in the orchard and Patsy's dress were forwarded to the State Bureau of Identification for examination, photographing and for a comparison.

Mr. Bradford of that department qualified himself as an expert and testified that it was impossible to get the blood grouping from the dress because it was contaminated with dirt

and fecal material; that as to People's Exhibit 6, the plaster of Paris cast of the shoe print, and as to the shoe, he had made and examined photographs of both of these exhibits (Photo Exhibit 7) and he proceeded to describe the points of similarity between them from the photographs. The first point was the similarity in the wear of the heel; second, a trade-mark which was on the rubber heel of the shoe '' REGENT '' which also appeared in the cast of the footprint; third, the characteristic thickness of the shoe as to the outside curve of the shoe sole and also the inside curve of the heel; fourth, as to the curvature of the heel and a circle on the heel below the trade-mark about the size of a 25-cent piece, which circle plainly showed in the plaster of Paris cast. Other similarities were the amount of heel wear on that circle, in addition to the brad marks, and the size of the heel, which comparison he said was a perfect fit. He thoroughly described and discussed the significance of eight points of similarity and concluded that there was one chance in 100,000,000 that the imprint was not made by the shoe in evidence; that for all practical purposes they were identical and it was his considered opinion that the footprint shown by the cast was made by that same shoe.

Another expert witness, employed by the Berkeley Police Department, testified that he was assigned to conduct an interrogation of defendant with the aid of the Keeler polygraph (Lie Detector). This test, apparently, was consented to by defendant and his attorney, in writing, and it was agreed that the result thereof might be considered as evidence in this case either on behalf of the People or on behalf of the defendant. The machine was displayed to the jury and its mechanism and the manner in which the test was given was explained and interpreted to the jury. He explained that he asked the defendant a series of 10 questions to be answered by ''yes'' or ''no.'' Some questions related to matters immaterial to the charge and others were directly pertinent to it. The graph was introduced in evidence. The expert concluded and stated that he was of the opinion from the test given defendant that defendant Houser was not then telling the truth in respect to the accusations made.

Defendant testified as to his army record and counsel for defendant offered his honorable discharge in evidence, without objection, and it was read to the jury in detail. He then testified that since his discharge he had been working rather steadily, supporting his father and sister, but that he had also

been drinking quite a bit; that on July 4th, he purchased a one-half pint of whiskey, had been swimming, and on that day, as was usual, he was clean shaven; that he went home about 7:30 that evening and was so intoxicated he did not recall whether or not he had anything to eat then; that he was home less than 30 minutes; that he went to the "White Swan," had a beer, played cards, and then drank two drinks of whiskey; that he lost $5.00 in 45 minutes and left; that he then went to the Lindsay Club "in and out two or three times" that evening; that sometime during the evening he ceased to remember; that he did not remember how or when he went home; that about 7:30 a.m. he arose, went to the store, and purchased some soap and did the family washing and shined his shoes; that he went to town about 10 a. m., dressed in a white tee-shirt, khaki pants, and work shoes; that while sitting in a bar an officer asked him to go with him; that he was taken to Patsy's home and Patsy said: "It looks like" the man, "I don't know, it looks like him"; that he did not know the nature of the charge against him but since he had heard discussed at the bar that morning the fact that some girl had been mistreated the night before, he "thought that was it." He testified that he had no recollection of any acts committed on the person of Patsy; that his own conviction was that he would never do such things. He stated that he believed his description to the officer of the course he took home on July 4th from the Lindsay Club related to the time he returned home in the afternoon. The officer emphatically told the jury that defendant related the course he took home on the night of July 4th at about 11:30 p. m.

Several character witnesses were called by defendant, who testified as to his general reputation as to the "traits involved . . . truth, honesty, integrity and morality," and, as suggested by the prosecutor "whether he is law-abiding or not." These witnesses testified generally that his reputation was good, or that they never heard anything against it. On cross-examination of the witnesses, over objection, the witnesses were asked if they had heard a report that prior to July 4, 1947, defendant was charged with, had pleaded guilty to, and was sentenced to the road camp for the offense of driving an automobile without the owner's consent, and was then on probation and ordered not to frequent places where intoxicating liquor was sold; or a report that he had been charged with and pleaded guilty to an offense of public intoxication and paid a fine; or a report that he was suspected of committing an act

of sodomy on a 10-year-old Lindsay boy last December. Some of the witnesses admitted hearing of some of the reports above suggested. One character witness was impeached by showing that he himself had been convicted of a felony (statutory rape). Defendant took the stand and endeavored to explain the factual background of these claimed reports and to minimize the seriousness of his previous convictions. A record of the facts, contrary to his explanation, was then produced by the People.

Counsel for the defendant made a plaster cast from defendant's shoe and had photographic exemplars made. He produced the exemplars and endeavored to explain to the jury and likewise to this court wherein the exemplars cast of the footprint taken by the prosecution were dissimilar.

█ The defendant's first point on appeal is the claim that Patsy's testimony as to her identification of him is unworthy of credence and should be rejected. In her testimony at the trial she positively identified the defendant as the man who took her to the grove. She rejected two other suspects and identified the defendant with the words: "If not him it sure looks like him." Her first identification of the defendant to the officer was that his shirt was khaki-colored. She nevertheless described his pants as "kinda bluish" and that he "smelled like whiskey." She did attach a moustache to his first description but later described it as "kind of a few hairs under his nose." These variations, when considered with her age and probable excitement at the time, may have been satisfactorily accounted for to the jury. Likewise, as to her statements at the preliminary examination with reference to defendant's identification. The committing magistrate testified at the trial that toward the latter part of her testimony defendant stood immediately in front of Patsy, with other officers of the court, because they could not hear, and that he noticed when defendant came close to her, while on the witness stand "she was much more hesitant in answering the questions put to her"; that she was "hesitant—and before she would answer, she would look at the defendant and then hesitated in answering certain questions." It is the People's argument that the position taken by the defendant in front of Patsy frightened her, and accordingly confused her in failing to answer the questions as she had previously answered them. This is not unlikely and the jury had the right to consider that factor.

■ In order to sustain a conviction it is not necessary that the identification of the defendant as the perpetrator of the crime be made positively or in a manner free from inconsistencies. It is the function of the jury to pass upon the strength or weakness of the identification and the uncertainness of the witness in giving her testimony. (*People* v. *Griggs,* 114 Cal.App. 133 [299 P. 555].)

The same contention as here made, was advanced in *People* v. *Slobodion,* 31 Cal.2d 555, 558 [191 P.2d 1], and it was there said: "Since the testimony of the prosecutrix was, so far as the record shows, worthy of belief, minor inconsistencies not destructive of her story were for the jury to pass upon." (See, also, *People* v. *Farrington,* 213 Cal. 459, 463 [2 P.2d 814].)

The question of the strength or weakness of the prosecutrix's testimony as to the identification of the defendant as the perpetrator of the crime was for the jury and for the trial court to determine on the motion for new trial. (*People* v. *Quinn,* 12 Cal.App.2d 752, 754 [55 P.2d 277].) From the record before us we are unable to say that, as a matter of law, there was no substantial evidence to support the identification of the defendant by the prosecutrix. (*People* v. *Friday,* 18 Cal.App.2d 197 [63 P.2d 303].)

■ The second point is that the identification of defendant's shoe as being the shoe that made the footprint is so "shot with inconsistencies and so contrary to the physical facts" that such identification and opinion based thereon is "wholly without evidentiary value," citing *Estate of Redfield,* 116 Cal. 637, 655 [48 P. 794]. The same argument made to this court in this respect, was made to the jury and to the trial judge on a motion for new trial and by them rejected. The expert endeavored to account for such claimed inconsistencies as were pointed out by defendant's counsel. The jury also made their own examination of the exhibits and considered them in connection with that testimony. This comparison was a factual question for the jury, which was, as expressed by counsel for the People, a "constitutional arbiter." There was sufficient evidence upon which the opinion of the expert could be properly based.

■ The next point involves the testimony pertaining to the lie detector test. It is claimed that such evidence has no evidentiary value and that such class of evidence is not regarded by the courts and therefore it was improperly admitted. It appears from the written stipulation signed by

defendant and his counsel, that the operator thereof, Mr. Riedel, is an expert operator and also an expert in interpreting results of such tests. It was likewise stipulated that such evidence, i. e., ''the question propounded by said operator and the answers given by said defendant and the recordings of said defendant's reactions thereto and everything appertaining to said test and the entire results of said tests including the opinions of said operator be received in evidence either on behalf of the people or on behalf of the defendant . . .'' and that ''said defendant hereby waives his constitutional privilege against self-incrimination to the extent that the same may be involved in the presentation in evidence of the foregoing matters.'' It would be difficult to hold that defendant should now be permitted on this appeal to take advantage of any claim that such operator was not an expert and that as to the results of the test such evidence was inadmissible, merely because it happened to indicate that he was not telling the truth when he denied to the officers that he took the girl to the orange orchard and committed the acts alleged upon her. (*People* v. *Hills*, 30 Cal.2d 694, 698 [185 P.2d 11].)

The claim that the dismissal of the first two counts of the information by the People modified the terms of the stipulation to the extent that the defendant was entitled to be relieved of the stipulation is not meritorious. The value and weight of the evidence produced on this subject was for the jury to determine.

■ Defendant next charges prejudicial errors in certain claimed misconduct of the prosecutor. One involved a series of questions pertaining to a social disease known as syphilis. The first mention of such disease emanated from counsel for defendant and it appeared during the cross-examination of Dr. Mickel. There he interposed a request that Patsy be examined to ascertain whether or not she was thus affected. Thereafter Mr. Carter stated: ''Q. In the interests of time, counsel, so far as this case is concerned, the only real point of interest there is whether or not this defendant was afflicted with such a disease, isn't it? Mr. Stevenson: It is, but counsel, you have opened up the line of questioning upon that and I intend to introduce the evidence on that. Mr. Carter: Introduce the evidence? He is not afflicted and never has been.'' The prosecuting attorney then stated to Mr. Carter: ''I presume you can make arrangements for Mr. Houser to have tests along the same lines. Mr. Carter: No,

counsel, and I assign your remarks as error prejudicial to this defendant." The medical examination of Patsy showed that she was not thus affected. At this point there was no evidence offered that defendant had been affected and no attempt on the part of the prosecution was made to establish that fact.

■ During the direct examination of defendant, his counsel introduced in evidence and read in detail to the jury a certificate of honorable discharge of the defendant from the army, which certificate contained his service record. It was offered as an "indication of the character of this defendant." The prosecutor stated that he did not really think it was material but he did not wish to impede the presentation of the defendant's case and he made no objection. It was accordingly admitted and so read to the jury. After the defendant testified in detail as to all the good points indicated by the record, on cross-examination the prosecuting attorney asked about a certain notation thereon (A.W.107). No objection was interposed and defendant voluntarily answered: "It has reference to—that is 62 days bad time . . . that has to do with venereal disease; that is covered by the army law." Articles of War 107 covers many matters and there is no showing of bad faith on the part of the prosecutor in propounding the question or that he had reason to believe that a venereal condition would be revealed. No mention was made to strike the answer. The matter was immediately dropped by both counsel.

Counsel for defendant now argues that a serious "blow was struck by the prosecutor," and since the admission of the discharge certificate in evidence was immaterial, and known by the prosecutor to be immaterial the question propounded on cross-examination was cross-examination on an immaterial matter and should have been stopped by the trial court even though no objection was made thereto by defendant's counsel, citing *People* v. *Westek*, (Cal.App.) 181 P.2d 108. A hearing was granted in the Westek case cited and relied upon by the defendant. (See *People* v. *Westek*, 31 Cal.2d 469 [190 P.2d 9].) In fact this later authority supports the conclusion that since defendant "opened the case" for the introduction of evidence on the question of his good moral character and his unimpeachable moral status and proceeded to establish this by his record pertaining to his honorable discharge, the prosecution had the right to cross-examine the witness as to what his complete record did in fact show, which fact tended to contradict, weaken, or modify its effect.

No prejudicial misconduct on the part of the prosecutor appears. (*People* v. *Buckley,* 143 Cal. 375, 389 [77 P. 169]; *People* v. *Turco,* 29 Cal.App. 608, 610 [156 P. 1001]; *People* v. *Hoffman,* 199 Cal. 155, 162 [248 P. 504]; *People* v. *Tuthill,* 31 Cal.2d 92, 98 [187 P.2d 16].)

■ The next complaint involves certain questions propounded on cross-examination by the prosecutor to the character witnesses produced by defendant. The questions as promulgated, i. e., as to whether or not the witnesses had heard of specific reports or rumors adverse to the trait of character involved, were carefully framed and clearly bring them within the rule set forth in *People* v. *Westek, supra,* p. 479, stating that there is a ''vast difference between inquiring about reports, rumors and the like, of a character witness, and questions as to what the witness knows of defendant.'' (See, also, *People* v. *Burke,* 18 Cal.App. 72 [122 P. 435]; *People* v. *Smith,* 100 Cal.App. 344, 347 [279 P. 1022].) The questions as propounded were not objectionable under the circumstances here related. ■ Defendant took the stand later and admitted the facts in reference to the foundation for the reports as to his former arrests and convictions and offered evidence as to the purported rumor of having been suspected of an act of sodomy on a 10-year-old boy. Defendant, apparently, did not enlighten the jury correctly as to the facts surrounding his previous arrests and confinement. Objection was made respecting the admission of certain records and the People's reference thereto establishing certain facts contrary to defendant's story. We see no merit to these objections. ■ Likewise, there is no showing that the questions propounded of the character witnesses on cross-examination were made in bad faith. It must be presumed on appeal that the district attorney was conscientiously discharging his duty as he understood it. (*People* v. *Burke, supra,* p. 89.)

Similar objections were made to certain portions of the prosecutor's argument to the jury. The entire transcript of the testimony, the record of counsel's argument, and the exceptions taken thereto, have been thoroughly read and examined in detail and we conclude that no prejudicial error resulted and that defendant was accorded a fair and an impartial trial.

Judgment and order affirmed.

Barnard, P. J., and Marks, J., concurred.