[Crim. No. 1281.   In Bank.—June 21, 1906.]

## THE PEOPLE, Respondent, v. ADOLPH JULIUS WEBER, Appellant.

CRIMINAL LAW—MURDER IN FIRST DEGREE—SUPPORT OF VERDICT.—Upon review of the evidence, it is *held*, that, though it is circumstantial and conflicting, it is sufficient to support the verdict of the jury, finding the appellant guilty of murder in the first degree.

ID.—IMPANELMENT OF JURY—SICK JUROR—SPECIAL VENIRE — RULING UPON DEFENDANT'S MOTION — PEREMPTORY CHALLENGES. — Where, immediately after twelve jurors were accepted and sworn, one juror was excused for sickness, and a special venire was summoned to complete the panel, the court properly sustained defendant's motion that the other jurors sworn be not excused, and properly overruled part of it, that each side be allowed the number of peremptory challenges remaining, as being premature, with privilege to renew it; and where a twelfth juror was accepted and sworn without any peremptory challenge, no question arises as to the number of peremptory challenges remaining unexercised.

ID.—OPENING STATEMENT—MOTION OF DEFENDANT.—A motion of the defendant, after an opening statement for the prosecution, to require it to be made more full as to what it was expected to prove, was properly denied. The purpose of the opening statement is merely to outline the testimony to be offered to enable the jury more clearly to sift and digest it; and the prosecution may open its case by evidence without any preliminary statement.

ID.—TESTIMONY OF PHYSICIAN PERFORMING AUTOPSY—ENTRANCE AND EXIT OF BULLET.—Conceding that the place of entrance and exit of a bullet found in the body of the deceased was not matter of expert evidence, yet, when the jury had no opportunity to see the body, the physician who performed the autopsy thereupon was properly allowed to give direct testimony to the physical fact which had come under his observation, and to illustrate by a diagram the place of such entrance and exit seen by him.

ID.—SIZE OF BULLET-WOUND—HARMLESS RULING.—The refusal to strike out the testimony of the physician, that he believed the bullet-wound to have been produced by a 32-caliber bullet, was harmless, when the bullet which inflicted the wound was recovered and was proved without dispute to have been a 32-caliber pistol-bullet.

ID.—IDENTIFICATION OF DEFENDANT AS PURCHASER OF PISTOL — COR-ROBORATION—CLOTHES WORN AT TIME.—Where it was proved that defendant was in San Francisco at the time when he was identified by a witness as having purchased from him the 32-caliber pistol offered in evidence, and who described the clothes worn by him at that time, the prosecution was properly allowed to prove by other

witnesses, in corroboration of such witness, the style of clothes which the defendant wore when in that city about that time.

ID.—EVIDENCE OF MOTIVE—VALUE OF PROPERTY OF DECEASED FATHER— INSURANCE.—Where the evidence tended to show that defendant had murdered his family and set fire to the house, and that he had lived in the family and was of age, and was inferentially familiar with his father's property, it was proper to allow the prosecution, upon the question of motive, to prove the value of his deceased father's property and the amount of insurance upon the house.

ID.—LEADING QUESTIONS — DISCRETION — ANSWERS NOT INJURIOUS. — Leading questions to a witness for the prosecution are within the sound discretion of the court; and the defendant could not have been harmed by them where the answer was in no sense injurious.

ID.—HEARSAY—COMPLAINT OF MOTHER — IMMATERIAL ERROR.—Though it was error not to strike out hearsay evidence of complaint by defendant's mother about his manners, made prior to the homicide, in his presence, without evidence as to his conduct at that time; yet the error is not so material as to require a reversal.

ID.—UNNATURAL CONDUCT OF DEFENDANT—QUESTION FOR JURY.—Evidence was admissible to show unnatural conduct and statements of the defendant on the day after the tragedy, as tending to indicate guilt. The weight of such evidence was a question for the jury.

ID.—ADMISSION OF DEFENDANT TO OFFICERS—CONFLICT WITH TESTIMONY TO ALIBI—PRELIMINARY PROOF.—Evidence of admissions of the defendant made to the sheriff and district attorney on the day after the homicide, not involving any confession of guilt, but merely showing his want of recollection of the route taken by him from the house after the fire, and thus conflicting with his positive testimony that he took a circuitous route, to show an *alibi,* was properly received without requiring preliminary proof of the voluntariness of the admissions.

ID.—CROSS-EXAMINATION OF DEFENDANT—PURPOSE OF TESTIMONY.—It was within the scope of legitimate cross-examination of the defendant's testimony as to the route taken by him to ask him if he had not so fixed it for the purpose of meeting the evidence of other witnesses who had seen him at certain places, as indicating that his recollection as to his route had been stimulated by the necessities of the case.

ID.—ARGUMENT FOR PROSECUTION—STATEMENT OF BELIEF FROM EVIDENCE.—A prosecuting officer has the right in his argument to state his views, beliefs, and convictions from the evidence; and it was not error to overrule an objection of the defendant to a statement by the attorney-general in his argument as to his belief that the evidence pointed unerringly to the defendant as the murderer of his mother.

ID.—ARRANGEMENT OF BULLETS RECEIVED IN EVIDENCE.—The attorney-general was properly permitted to arrange the bullets taken from

the bodies of defendant's deceased mother and sister, and other bullets fired from the pistol which was in evidence, some by the prosecution and some by the defense, in such order as he saw fit for the purposes of his argument, the jury being properly informed by the court that they might arrange them in any other order which they saw fit.

ID.—ATTACK · UPON REPUTATION OF WITNESS—CROSS-EXAMINATION OF REBUTTING WITNESS—IMPROPER OBJECT.—Where the reputation of the pawnbroker as a witness, who had testified to selling the pistol to the defendant, was attacked by the defense, and a witness had testified in rebuttal to his good reputation, and had stated on cross-examination that he did not know that the license of the pawnbroker had been revoked, further questions on that subject, the manifest object of which was to introduce evidentiary matter in the form of questions, to the detriment of the witness assailed, were properly disallowed.

ID.—HYPOTHETICAL AND SPECULATIVE QUESTION.—A further question in the same line on cross-examination of the rebutting witness, whether ''if any of these matters had been brought to your mind, would it change your opinion?'' was properly disallowed as being hypothetical and speculative, as well as a veiled attempt to present the excluded evidentiary matter.

ID.—STRIKING OUT TESTIMONY OF EXPERT AS TO BULLETS.—Where an expert had testified that the bullets taken from the bodies of defendant's deceased mother and sister had, in his opinion, been fired from the pistol in evidence, basing it upon similarity of bullets fired by himself from the same pistol, and the court had stricken out his testimony as to the bullets on the ground that the question was one for the jury, and the whole testimony of the expert was treated as stricken out, the fact that in reciting the exhibits referred to, the exhibit of the bullet taken from the body of the sister was omitted, could not have resulted in injury to the defendant.

ID.—EVIDENCE OF BULLETS FIRED BY EXPERT.—Evidence was properly admitted of the bullets fired by the expert from the pistol in evidence, and an objection that they were not fired ''under the same conditions as those existing at the time of the homicide'' was properly overruled, where it was shown that the pistol was in the same condition, except as to exterior blood-marks upon its surface, as when found concealed in the Weber barn. The similarity of the bullets fired from it to those found in the bodies was pertinent and important evidence, as tending to fix the identity of the weapon from which the fatal shots were fired.

ID.—INSTRUCTIONS AS TO REASONABLE DOUBT.—The court properly refused requested instructions as to reasonable doubt which were elsewhere embodied in the charge, and an instruction that if the jury were satisfied beyond a reasonable doubt of the guilt of the defendant they should find him guilty, is not inconsistent with a further instruction that the evidence of defendant's guilt was circumstantial,

and that each material circumstance must be proved to their satisfaction beyond a reasonable doubt, or they must acquit.

ID.—CONSTRUCTION OF INSTRUCTIONS.—The instructions given must be taken together as a whole, and where it appears that, on reading them, the jury were fairly and impartially charged, no single instance of striking out the concluding language of a requested instruction would warrant a reversal.

ID.—INSTRUCTION AS TO PRESUMPTION OF INNOCENCE—MODIFICATION ELSEWHERE GIVEN.—Where the court gave a requested instruction as to the presumption of innocence of the defendant, which accompanies him throughout the trial and in the jury-room, and which will avail to acquit him unless overcome by sufficient proof of guilt, the modification thereof by omitting the matter of necessary proof beyond a reasonable doubt, which was in itself unobjectionable, was not injurious, where the court had elsewhere instructed the jury that unless they were "satisfied beyond a reasonable doubt that the presumption of innocence which the law gives him is overthrown, it is their duty to render a verdict of not guilty."

ID.—MODIFICATION OF ERRONEOUS INSTRUCTION.—Where an erroneous instruction might have been wholly rejected, the modification thereof to eliminate objectionable matter was proper.

ID.—INSTRUCTION AS TO EVIDENCE STRICKEN OUT.—It was not error to refuse to give a requested instruction that the evidence of certain named witnesses had been stricken out, where the court had given an instruction as to all evidence stricken out; and the naming of the particular witnesses, the list of which was incomplete, would have served to confuse the jury.

ID.—ABSTRACT INSTRUCTION—POSSESSION OF ARTICLES.—A mere abstract instruction, "that the mere possession of any article, whether it can or cannot be used in the perpetration of crime, is not of itself sufficient to convict the defendant, but is a mere circumstance which may or may not tend to prove the charge against the defendant," was properly refused.

ID.—MODIFICATION OF REQUEST—"INDEPENDENT JUDGMENT" OF JURORS. —A requested instruction that "defendant is entitled to the independent judgment of every juryman," was properly modified so as to make it read that "each side" is so entitled.

ID.—INSTRUCTION AS TO "ALIBI."—Where the court properly defined an "alibi," it cannot be urged that the court did not more fully instruct the jury on that question, where the defendant, whose duty it was to request further instruction if desired, made no such request.

ID.—NEW TRIAL—CHANGE OF THEORY OF PROSECUTION AS TO MANNER OF CRIME.—The defendant was not entitled to a new trial because the prosecution offered at the argument on the trial a different theory as to the manner of the crime from that offered on the preliminary examination, where no deception is shown to have been

practiced by the prosecution, and where it is not shown that upon a new trial any new evidence would have controverted the theory argued at the trial. The prosecution was not bound to offer any theory as to the manner of the crime, and might properly argue that it was committed in any manner which the evidence showed reasonably possible.

ID.—NEWLY DISCOVERED EVIDENCE—DISCRETION.—*Held,* that affidavits of newly discovered evidence tending to impeach the testimony of the pawnbroker as to the identity of the pistol sold by him to defendant, one of which, if believed to be true, would have justified a new trial, but which was meager in detail and open to grave suspicion from the statements which it contained as well as from the absence of statements it should contain, were addressed to the discretion of the court, and that it cannot be said that it abused its discretion in distrusting the affidavits and in denying the new trial for the alleged newly discovered evidence. [Beatty, C. J., dissenting.]

APPEAL from a judgment of the Superior Court of Placer County and from an order denying a new trial. J. E. Prewett, Judge.

The facts are stated in the opinion of the court.

Grove L. Johnson, Ben P. Tabor, F. P. Tuttle, and Samuel J. Pullen, for Appellant.

The evidence was circumstantial and insufficient for conviction. The court erred in instructions on reasonable doubt, which were more open to criticism than those held incorrect by this court. (*People* v. *Chin Heong,* 86 Cal. 332, 24 Pac. 1021; *People* v. *Kernaghan,* 72 Cal. 609, 14 Pac. 566; *People* v. *Paulsell,* 115 Cal. 6, 46 Pac. 734; *People* v. *Bemmerly,* 87 Cal. 177, 25 Pac. 266; *People* v. *Ah Sing,* 51 Cal. 572; *People* v. *Lenon,* 72 Cal. 625, 21 Pac. 967.) The court erred in modifying requested instructions. (*People* v. *Lachanais,* 32 Cal. 433; *People* v. *Teshara,* 134 Cal. 542, 66 Pac. 798; *People* v. *Clark,* 145 Cal. 727, 79 Pac. 434; *People* v. *Chadwick,* 143 Cal. 116, 76 Pac. 884; *People* v. *Dolan,* 96 Cal. 315, 31 Pac. 107; *People* v. *De Graaff,* 127 Cal. 676, 60 Pac. 429; *People v. Winthrop,* 118 Cal. 85-92, 50 Pac. 390; *State* v. *Hickam,* 95 Mo. 322, 6 Am. St. Rep. 54, 8 S. W. 252; *People* v. *Phipps,* 39 Cal. 334; *People* v. *Williams,* 17 Cal. 142.) Defendant was entitled to a new trial on the first ground stated (*Bluitt* v. *Miller,* 131 Cal. 149, 63 Pac. 157), and for newly discovered evidence on the showing

made. No counter-affidavits were filed by the prosecution, and the newly discovered evidence could not have been reasonably introduced at the trial. (*People* v. *Sing Yow,* 145 Cal. 1, 78 Pac. 235; *People* v. *Demasters,* 109 Cal. 607, 42 Pac. 236.) The court should unhesitatingly have set aside the verdict upon a showing of a reasonable doubt of the guilt of the defendant. (*McCoy* v. *People,* 175 Ill. 224, 51 N. E. 777; *Gilman* v. *People,* 178 Ill. 19, 52 N. E. 967; *Flanagan* v. *People,* 214 Ill. 170, 73 N. E. 347.)

U. S. Webb, Attorney-General, A. K. Robinson, District Attorney of Placer County, and George W. Hamilton, for Respondent.

The instructions on reasonable doubt are supported by the following cases: *People* v. *Cronin,* 34 Cal. 112; *People* v. *Durrant,* 116 Cal. 179, 49 Pac. 75; *People* v. *Verenesenec-kockockhoff,* 129 Cal. 497, 58 Pac. 156, 62 Pac. 111. A court is not bound to repeat itself at request of counsel. (*People* v. *Cochran,* 61 Cal. 550; *People* v. *Chaves,* 122 Cal. 140, *People* v. *Armstrong,* 114 Cal. 573, 46 Pac. 611; *People* v. *Mendenhall,* 135 Cal. 344, 67 Pac. 325; *People* v. *Brittain,* 118 Cal. 411, 50 Pac. 664; *People* v. *Sing Yow,* 145 Cal. 10, 78 Pac. 235; *Olive* v. *State,* 11 Neb. 30, 31, 7 N. W. 444.) The court properly instructed on the law as to *alibi,* and if defendant wished further instruction thereon he should have requested it. (*People* v. *McNutt,* 93 Cal. 658, 29 Pac. 243; *People* v. *Matthai,* 135 Cal. 445, 67 Pac. 694; *People* v. *Olivera,* 127 Cal. 381, 382, 59 Pac. 772; *People* v. *Balkwell,* 143 Cal. 264, 76 Pac. 1017.) The charge must be taken as a whole, and each paragraph need not contain all the conditions and limitations expressed in others. (*People* v. *Armstrong,* 114 Cal. 573, 46 Pac. 611; *People* v. *Mendenhall,* 135 Cal. 346, 67 Pac. 325.) The court properly ruled on the questions as to a sick juror and the matter of peremptory challenges. (*People* v. *Brady,* 72 Cal. 490, 491, 14 Pac. 202; *People* v. *Van Horn,* 119 Cal. 332, 51 Pac. 538.) The court properly ruled upon the question of opening statement. (*People* v. *Stoll,* 143 Cal. 691, 77 Pac. 818; *People* v. *Ellsworth,* 92 Cal. 595, 28 Pac. 604; *People* v. *Sing Yow,* 145 Cal. 9, 78 Pac. 235.) The physician properly testified as to the location of the wounds observed by him on the autopsy. (*People* v. *Phelan,* 123 Cal. 560, 56 Pac. 424.)

Counsel may properly state in argument what they believe the
evidence shows. (*People* v. *Romero,* 143 Cal. 460, 77 Pac.
163.) The verdict is supported by the evidence, and no ques-
tion of law arises upon its sufficiency. (*People* v. *Fitzgerald,*
138 Cal. 39, 70 Pac. 1014; *People* v. *Maroney,* 109 Cal. 279, 41
Pac. 1097; *People* v. *Gonzales,* 143 Cal. 606, 77 Pac. 448;
*People* v. *Donnelly,* 143 Cal. 398, 77 Pac. 177.) No prelim-
inary proof was required of admissions not directly involving
a confession of guilt. (*People* v. *Jan John,* 144 Cal. 286, 77
Pac. 950; *People* v. *Ammerman,* 118 Cal. 23, 50 Pac. 15;
*People* v. *Parton,* 49 Cal. 632; *People* v. *Leroy,* 65 Cal. 613, 4
Pac. 649; *People* v. *Hickman,* 113 Cal. 86, 45 Pac. 175; *People*
v. *Ashmead,* 118 Cal. 509, 50 Pac. 681.) The motion for a new
trial was properly denied. The affidavit of Harrington does
not contradict that of Carr in a material matter, and the
affidavit of Beard shows evidence of falsity on its face justify-
ing the court in distrusting it. (*People* v. *Clarke,* 130 Cal. 647,
63 Pac. 138; *People* v. *Ah Lee Doon,* 97 Cal. 178, 179, 31 Pac.
933; *People* v. *Freeman,* 92 Cal. 367, 28 Pac. 261; *Tibbet* v.
*Sue,* 125 Cal. 544, 58 Pac. 160; *People* v. *Howard,* 74 Cal. 547,
16 Pac. 394; *People* v. *Sutton,* 73 Cal. 243, 15 Pac. 86; *People*
v. *Gonzales,* 143 Cal. 605, 606, 77 Pac. 448; *People* v. *Rushing,*
130 Cal. 449-454, 80 Am. St. Rep. 141, 62 Pac. 742; *Oberlander*
v. *Fixen & Co.,* 129 Cal. 690, 62 Pac. 254; *People* v. *Sing Yow,*
145 Cal. 2, 78 Pac. 235.)

HENSHAW, J.—On November 10, 1904, Julius Weber
with his family resided in Auburn, Placer County. His family
consisted of his wife, Mary Weber; his daughter, Bertha
Weber, aged eighteen; a son, Earl Weber, aged nine; and a
second son, Adolph Julius Weber, aged twenty, the defendant
herein. The home was a two-story frame building situated
within its own grounds, some little distance away from the
house of any neighbor. At about six o'clock of the evening
of November 10th, the family was seen alive in the house by
passers-by. At 7:35 of the same evening the house was dis-
covered to be on fire, and at 7:42 the fire-alarm bell was rung.
The first people to arrive saw no living person within or about
the buildings. A number of firemen and other citizens were
soon upon the ground. A front room upon the ground floor
was entered by them through the window. This room con-

tained a piano, and is designated "the piano-room." It was full of thick, heavy smoke, but no fire was detected. From this room three bodies were carried,—Mary Weber, Bertha Weber, and Earl Weber. Mary Weber and Bertha Weber were both dead, and had been frightfully burned after death. The little boy was not burned at all. He was alive, though unconscious, when removed from the room to the yard, but died almost immediately after. He was in his night-clothes. They were moist with blood. An autopsy disclosed that Mary Weber and Bertha Weber came to their death by gunshot wounds. Mary Weber was shot twice, Bertha Weber once. In each case the wounds were almost immediately fatal; neither could have survived the wounds more than five minutes. The bullets were recovered, and were pistol-bullets of 32 caliber. The burns were inflicted upon the bodies after death. The little boy had not been shot. His death was caused by blows upon the head, inflicted with some blunt instrument and subsequent suffocation. The house burned to the ground. The following day the body of Julius Weber was found in the bathroom of the dwelling. It had been subjected to great heat and was frightfully burned. An autopsy disclosed that the cause of his death was a bullet-wound inflicted by a bullet of like caliber to those which killed the others. Upon November 22, 1904, there was found in the basement of the Weber barn, about two hundred and fifty feet from the dwelling, a revolver described as an "Iver-Johnson 32 caliber revolver, old style." When found, there was dry blood upon it and one or two light-colored hairs, and the pistol contained the shells of five discharged cartridges. The defendant was in a clothing store in Auburn about five minutes to seven on the evening of the tragedy. He there purchased a pair of trousers. He took off his old trousers in the store. They were rolled in a bundle by himself, and afterwards more compactly by the storekeeper, who wrapped them in a paper and returned them to the defendant. The defendant's manner at this time was not such as to excite attention. He comported himself as usual. Prior to that he had been seen on Brewery Lane, going from his house to Auburn at about 6:30 P. M. He was seen in the washroom of the American Hotel at 6:40 or 6:43 P. M., where he washed his hands, and hurriedly left the place. He was seen on the street going towards Cohn's store, where he purchased the trousers at about

6 : 45. He was on the streets of Auburn after this time until the alarm of fire, and his appearance and conduct during that time were natural. Upon hearing the alarm, he ran to the Weber house in company with a friend, carrying the bundle which contained his old trousers. These trousers he used to break in a window to gain access to the house. He did enter the house, and testifies that he assisted in removing the body of his little brother. His testimony as to this was contradicted. The bundle containing the trousers was burned in the house. Upon November 11th he was examined by the district attorney and the sheriff as to his knowledge of the fire and the homocides, and his answers were reduced to writing. On the evening of the same day he testified as a witness at the coroner's inquest. Upon the following day he was arrested and charged with the murder of his family. Upon preliminary examination he was held for murder. An information was filed against him by the district attorney upon November 29th, charging him with the murder of Mary Weber, his mother. Upon this charge he was brought to trial in January, 1905. The trial consumed about a month, the jury returning a verdict of guilty of murder in the first degree. His motion for a new trial was denied, and he was sentenced to be hung. From that judgment and from the order denying his motion for a new trial he prosecutes this appeal.

The prosecution contended, and to this their evidence was addressed, that the defendant had killed his parents, sister, and brother in the manner indicated; that his father was killed in the bathroom, the mother and daughter in the piano-room, the little boy beaten while in his night-clothes, and brought to the piano-room; that the murderer then saturated the clothing of Mrs. Weber and the daughter with inflammable liquid and set fire to it; that he likewise set fire to the house; then, hiding the pistol in the barn, hurried to Auburn to establish an *alibi;* that the heavy, black smoke from the piano-room came from the burning liquid and burning flesh, and the room being inclosed, the oxygen was soon exhausted and the flames thus smothered, in support of which it was shown that when the burned bodies were carried to the open air the fire revived and sparks were seen upon the clothing. The people's contention was, further, that defendant hurried to the washroom of the American Hotel to remove the

blood and other traces of crime; that the trousers which he wore were blood-stained, which necessitated the purchase of a new pair; and that he deliberately threw the old pair into the burning building in order that this evidence of his crime might be destroyed. Stress also is laid upon the asserted unnatural conduct of the defendant during and after the fire; that he did not approach the bodies of his mother and sister after they had been taken from the house, nor inquire about them.

It was shown that Julius Weber was worth about fifty thousand dollars. Upon the death of the other members of the family this defendant would succeed to property of this value. Herein the prosecution imputed the motive for the crimes.

Upon leaving the fire, the defendant went to the home of a friend, and, on account of his excited condition, a doctor was called. The doctor dressed a cut upon the young man's hand, which probably he had received in forcing a window of the burning house. The defendant wanted to know if his mother were alive. The doctor replied that his mother was in the care of friends with a physician in attendance, and that he could not see her, nor could he see any member of the family that night. The defendant said: "I want to know if my mother is alive. I know she is dead. They told me she is alive, but I know she is dead." The doctor gave him a composing draft, and the young man said that if he was permitted to go out for a time he would come back and remain quietly all night. To this the doctor consented, and the defendant went out with his friend, and, at his own suggestion, visited an ice-cream parlor, where they had an ice-cream soda. After that they called at the American Hotel to visit some young ladies, the defendant making the suggestion, saying, "Let's go see the girls in the hotel." The foregoing is instanced merely as an example of the unnatural conduct which it is insisted by the prosecution the defendant displayed after the frightful tragedy. Further, the prosecution produced a pawnbroker of San Francisco, who identified the Iver-Johnson pistol as one which had been owned by him, and which in turn he had sold to defendant, positively identifying the defendant and describing with some particularity the clothing which he wore at the time of the purchase. All of the evidence was wholly circumstantial, and the defense contends that it was likewise

wholly insufficient to uphold a judgment of conviction. This
is based upon the inconsistency and irreconcilability of the
evidence. Thus, it is said that the defendant must have left
his home before 6:30 P. M., since he was seen upon Brewery
Lane walking to Auburn at that hour, and was afterwards, and
up to the time of the alarm of fire, seen so frequently in the
town of Auburn as to render a surreptitious return to the house
impossible. Yet, that Bertha Weber was heard by a disinter-
ested witness playing upon the piano at 6:40 or 6:45 P. M.,
and another disinterested witness heard the scream of a woman
from the house between 6:40 and 7 P. M.; and that the fire
was first discovered in the house at about 6:30 or 6:45. From
this it is argued that as Bertha Weber was heard playing the
piano somewhere between 6:30 and 6:45, her brother, who was
at that time absent from the house, could not have been the
murderer; and, moreover, that it would have been impossible
for him to shoot three people, all adults, haul the bodies of
two of them into the piano-room, where there was no fire, and
set fire to them, go upstairs and beat his little brother upon
the head and carry his body down to the piano-room in the
length of time established by the evidence. But to this it must
be answered that the witnesses who fixed the time do not pre-
tend to do so with positiveness and exactness. They fix it as
"about" such an hour, and, even if it be conceded that an
irreconcilable conflict in the evidence arises, it must be noted
that the testimony of the piano-playing and of the woman's
scream was offered by the defense, and it was the province
of the jury to weigh and decide and to reconcile the testimony
if they could, and, if the conflict was irreconcilable, to affix
their own value to the contradictory evidence. And it must
be added that when allowance is thus made for inaccuracies
as to time, there is nothing in the whole case to show that
the defendant could not have committed these horrible deeds,
with all their attendant circumstances, and still have made
his appearance upon the streets of Auburn at the time indi-
cated. Upon this subject, therefore, it must be concluded
that the evidence is sufficient to justify the verdict.

To the rulings of the court in the impanelment of the jury,
and upon the admission and rejection of evidence, appellant's
counsel reserved very numerous exceptions. The same is
true of the court's rulings in giving, in refusing to give, and

in modifying instructions. No one of these rulings has failed to receive the careful investigation which the gravity of the case warrants, and we pass to a consideration of those which call for particular mention and discussion.

After twelve jurors had been sworn to try the cause, but before the information had been read or the plea of the defendant stated, or the opening statement of the prosecution made, one of the twelve was excused because of illness. A special venire was issued and a twelfth juror accepted and sworn, without any challenge interposed. At the time of the final completion of the jury, the defendant had nine peremptory challenges unused. Upon the discharge of the sick juryman, defendant moved the court that the remaining eleven jurors be not discharged, and that the trial be proceeded with by calling from the box the name of another juror, and that each side be allowed the number of peremptory challenges remaining after deducting from the original number the number already used. The court assented to the suggestion, but reserved its ruling concerning the number of peremptory challenges to which each side would be entitled, denying the motion as premature, with leave to renew it at any time. In this state of the case no question arises as to the number of peremptory challenges, since neither side had exhausted the number to which it was clearly entitled under the law, and since neither side exercised, or attempted to exercise, any challenge upon the juror last called to the box. The ruling of the court in this matter was correct, and is supported by *People* v. *Brady,* 72 Cal. 491, [14 Pac. 202] ; *People* v. *Van Horn,* 119 Cal. 332, [51 Pac. 538].

The attorney-general made an opening statement to the jury, at the conclusion of which the defense moved that the prosecution be required and directed by the court to state to the jury what the other facts referred to by the attorney-general were, and what they expected to prove, and on what a reliance for a conviction of the defendant was placed. The court denied the motion. It is asserted that Penal Code section 1093, subdivision 2, is mandatory, that the prosecution must open the case, and that in so doing it must state what it expects to prove. Such, however, is not the meaning of the law. A prosecution may open its case by the introduction of evidence without any preliminary or opening statement.

The purpose of such statement is merely to outline the testimony about to be offered, to the end that the jury may more clearly sift and digest it.  (*People* v. *Stoll,* 143 Cal. 691, [77 Pac. 818]; *People* v. *Ellsworth,* 92 Cal. 595, [28 Pac. 604].)

The physician who performed the autopsy upon the body of Mary Weber was permitted to testify as to the place of entrance and of exit of the bullet found in her body. It is said that special skill will not entitle a witness to give an opinion, where the jury is capable of forming its own conclusions from facts susceptible of proof in the common form. This is undoubtedly true, and it may be conceded that the observation even of the unprofessional eye could determine which was the point of entrance and which the point of exit, and if the body had been exhibited to the jury they could have formed their own conclusions from their own observations. But they had not this opportunity, and the physician was merely illustrating upon a diagram and testifying to a matter which had come under his own observation, so that even if it be conceded that the question did not call for expert evidence, the answer was none the less admissible as being direct testimony to a physical fact which the witness had observed and the jury had no opportunity of seeing.

The same witness was allowed to answer a question as to the size of the wounds on the body referred to as bullet-wounds, and answered, "I believe them to have been produced by a 32-caliber bullet." A motion to strike out the answer was denied. It is sufficient here to say that as the bullet which inflicted the wound was recovered from the body, and was proved without dispute to have been a 32-caliber pistol-bullet, the answer could not have been injurious.

It was shown by the prosecution that the defendant was in San Francisco during the months of June, July, August, and September, of 1904. The pawnbroker, Henry Carr, had identified the defendant as purchasing from him the pistol introduced in evidence in August, 1904, and this witness described the attire of the defendant at the time of the purchase. Through the testimony of the witnesses Mrs. Muston, Mrs. Hilliker, and others, the prosecution showed the style of clothes which the defendant wore in San Francisco during those months. The effort was directed to establishing that the

clothes which the defendant actually wore during that time were such clothes as Henry Carr described the defendant as wearing at the time of the purchase of the pistol. This evidence was admissible in corroboration of Carr's identification.

Proof of the value of the property belonging to Julius Weber was objected to upon the ground that it was not shown that the defendant, a mere youth, knew the value of the property of his father, or the amount of insurance upon it, and unless he did so know, the testimony had no pertinency upon the question of motive. But, in the absence of such a direct showing, it was established that the young man, nearly twenty-one years of age, had been living with his family upon the property, and was continuously surrounded by evidence of his father's possessions, and it would be no strained, but a natural inference, for the jury to say that he had at least some knowledge of the matter.

Touching the conduct of the defendant upon the morning after the fire, a witness was asked and permitted to answer the following questions: "Did he, during any of that time [about three minutes], say anything about his mother being dead? Did he speak about any of the members of his family being dead? During these three minutes that you were in his presence, did he tell you that any members of his family were dead?" The only objections to these questions are that they are leading. But even leading questions are permissible within the sound discretion of the court. The answers were in no sense injurious, the witness replying, "He said something, or Adrian Wells said something to him; I did n't understand, and he said, 'I don't see why they could not get out of the house.'"

Mrs. Snowden was allowed to testify that Mrs. Weber said to her in the presence and hearing of defendant: "Dolphy is so mean to me I am almost afraid to ask him to do anything for me; he does aggravate me so." Defendant moved to strike out this statement, and the motion was denied. It should have been granted. It is not every statement made in the presence and hearing of a person which is admissible in evidence against him. Nor is the statement, so far as its contents are concerned, admissible as evidence at all. It is merely the conduct of the person in connection with the declaration, his failure to act as it might reasonably be expected

that an innocent person would act, which is the evidence, and the declaration is received merely to illustrate the person's conduct under the particular circumstances. (Jones on Evidence, sec. 291; *People* v. *Teshara*, 134 Cal. 544, [66 Pac. 798]; *People* v. *Philbon*, 138 Cal. 530, [71 Pac. 650].) Nothing is disclosed as to the conduct of the defendant at the time the statement was made, so that it stands upon the record as a naked hearsay declaration of the mother of the defendant. But even so, it is of such trifling character as not to justify a reversal of the cause.

Many questions were asked of different witnesses concerning the actions and statements of the defendant upon the day after the tragedy. They were all offered in proof of the alleged unnatural and thus guilty conduct of the accused. It was pertinent to show what the defendant did or did not do under those trying circumstances. It was permissible to argue that he did or did not act as an innocent person would have acted. The weight of all this testimony was for the jury, but it was not error to admit it.

Objection is made to the introduction of the statement made by defendant to the district attorney and to the sheriff upon the day after the tragedy. It is said that it appears that it was not a voluntary statement, but one made under duress. A reading of the statement, however, discloses that it contained no admission or confession of guilt, and it is only as to the latter class of statements that the rule requiring preliminary proof of their free and voluntary making has application. So, in *People* v. *Jan John*, 144 Cal. 286, [77 Pac. 950], it is said: "But this rule applies only to confession of guilt, and does not forbid proof of other admissions of the defendant, though these, taken in connection with other proofs, may tend to prove him guilty." (See, also, *People* v. *Ammerman*, 118 Cal. 32, [50 Pac. 15]; *People* v. *Hickman*, 113 Cal. 86, [45 Pac. 173].)

In the statement which the defendant made to the district attorney and sheriff upon the day after the homicide, and also in the testimony which he gave before the coroner's jury, he described the course which he took in leaving his father's house and going into town. This course carried him directly across Brewery Lane, and, by a roundabout and circuitous way, to a point on College Lane where three routes were open to him

to go to Cohn's store. In both of those statements he declared that he did not know, could not recall, what route he had taken from College Lane to Cohn's store. This circuitous route, if actually taken by the defendant, would have consumed some fifteen or twenty minutes of time, and would have rendered it improbable that he could have been at his home at the time the murders were committed. Another route was open to him, much shorter and more direct, from his house to Cohn's store. This was down Brewery Lane. This latter route would have carried him past the American Hotel, where it was in evidence that he was seen washing his hands and hurriedly departing, in front of Crosby's livery stable, which he was seen passing, coming from the direction of the American Hotel and so to Cohn's store. From College Lane no one of the three routes readily accessible to defendant would have carried him past these places where the witnesses saw him. Upon the trial he heard the testimony of these witnesses, and when in turn he took the stand he described with minute circumstance the route which he had taken from College Lane. That route involved a divergence from the direct course to Cohn's store, and the witness testified that he did diverge in his course and walk down Sacramento Street, upon which was the American Hotel and Crosby's stable; that he passed these places upon the opposite side of the street, crossed over and came back to Cohn's store, passing in front of the American Hotel, though not stopping there. Upon cross-examination the witness was asked if he had not fixed his route for the sole and single purpose of meeting the testimony of those who had seen him at the American Hotel and Crosby's stable. This question was, in the condition of the case as shown, within the limits of legitimate cross-examination, since it was at least within the scope of fair argument before the jury to urge that the defendant's recollection as to his route had been stimulated by the necessities of his case.

In the course of his argument to the jury, the attorney-general said: "We believe, gentlemen, and I say so not without a feeling of pity, not without a feeling of sadness, not without a feeling of pathos, but with a feeling that the evidence in this case as it stands to-night recorded in the notes of this trial, points unerringly, points accurately, beyond the possibility of mistake, to this defendant as the murderer of Mary Weber."

Objection was made to this language. It was urged upon the trial court that it was improper for a prosecuting officer to express his belief in the matter of the guilt or innocence of an accused, and that he could with propriety argue only upon the facts in evidence. To this objection the court ruled in the following language: "The court does not feel it incumbent upon itself to determine the sufficiency of the point as a legal proposition, because the observation of the attorney-general was that he believes that the evidence points to that conclusion. The objection is overruled." It is of course improper for a prosecuting officer to assert his personal belief or personal conviction as to the guilt of an accused, if that belief or conviction is predicated upon anything other than the evidence in the case. But, upon the other hand, such prosecuting officer has the indisputable right to urge that the evidence convinces his mind of the accused's guilt. Indeed, it would be mere stultification if it were contended that the prosecuting attorney could argue to the jury that the evidence should convince their minds, although it did not convince his. A prosecuting officer, therefore, has the right to state his views, his beliefs, his conviction as to what the evidence establishes. (*People* v. *Romero,* 143 Cal. 460, [77 Pac. 163].) Nor can we perceive the slightest impropriety nor just cause of exception in the remarks which the court made in ruling upon this matter.

The bullets taken from the body of Mary Weber and of Bertha Weber, as to which evidence had been introduced that they had been fired from the Iver-Johnson pistol also in evidence, were with certain other bullets fired from the same pistol, some by the prosecution and some by the defense, all arranged by the attorney-general in a certain order and so exhibited to the jury, the bullets themselves, of course, having been duly admitted in evidence. Objection was made to the exhibition of the bullets to the jury as arranged. It is said that this should not have been permitted; that the jurors could take the bullets and examine them as they chose, not having one bullet placed in juxtaposition with other bullets. The objection was overruled. It cannot be perceived wherein lay the error in permitting the attorney-general to place these exhibits in any order or in any sequence to point out similarities or dissimilarities, or for any other legitimate purpose con-

nected with his argument. Such, in effect, was the ruling of the trial court. To that ruling it was added that the jury might and doubtless would at their convenience rearrange them in any other order which they saw fit.

The reputation of Henry Carr, the pawnbroker who testified that he had sold the pistol to the defendant, having been attacked by the defense, affirmative evidence to meet it was offered by the prosecution in rebuttal. The witness Abrahams, having testified that Carr's reputation was good, upon cross-examination, without objection, was asked and answered the following questions: "Q. Have you ever heard discussed the fact as to what business he carried on?—A. No sir.—Q. Have you ever been told that his license to carry on business has been revoked?—A. I am not aware of the fact." And then followed this language: "Q. Have you ever been told that he had a lengthy examination before the board of police commissioners and that his license was revoked?" To this objection was made and sustained. It is of course legitimate cross-examination of a character witness to ask whether he has ever heard of the person whose reputation is under investigation having been accused of committing acts inconsistent with the character which he has attributed to him. (*People* v. *Gordon,* 103 Cal. 568, [37 Pac. 534]; *People* v. *Moran,* 144 Cal. 48, [77 Pac. 777].) In this case the witness had been asked, and had answered, that he had not heard that Carr's license to carry on business in San Francisco had been revoked. It is nowhere contended by the astute counsel for the appellant, either in the record, which is full upon the question, nor in their briefs, that the first answer was evasive, and that therefore they had the right to pursue the inquiry further. It is not to be believed that if counsel had considered the answer evasive or had considered it other than as a direct answer they would not have insisted upon their right to ask the second question upon this ground. They did not do so in the trial court, they do not do so in this court, and the only fair inference to be derived from this state of the record and of the briefs is that this answer was accepted as positive and direct both by court and by counsel. So accepting it, the ruling of the court upon the subsequent question was perfectly proper, and the remarks of the court in pronouncing its rulings were equally unobjectionable. It is apparent that the succeeding

question would have elicited another negative answer, and that the purport of the question was not to obtain the witness's answer, but to get the substance of the inquiry before the jury as an evidentiary fact, to the detriment of the witness Carr. This obvious purport of the question justified the court's ruling in excluding it.

The court's ruling excluding the subsequent question of the witness was likewise proper. That question was: "If any of those matters had been brought to your mind would it change your opinion?" The question itself was hypothetical and speculative, and, moreover, was but another veiled attempt to present to the jury the excluded matter.

Howard Carr, an expert in small arms, had been permitted to testify that the bullet taken from the body of Mary Weber (exhibit G) and the bullet taken from the body of Bertha Weber (exhibit H) had both been fired from the Iver-Johnson pistol (exhibit Q). Upon the next day, in doubt of the soundness of its ruling, in view of testimony subsequently given by Carr that his opinion was that the bullets had been fired from that pistol because he had compared the markings on the bullets taken from the bodies with the markings on the bullets which he had fired from the pistol, the court concluded to strike out the testimony in these words: "In other words, I hold that the comparison of the two bullets on the one hand with the two bullets on the other is not a matter of expert testimony, but one within the ordinary capacities of the average juror or citizen. Now this being so, I wish to strike out the statement of the expert, that in his opinion the two bullets taken from the bodies were fired from this pistol, leaving that as a question for the jury to determine by an inspection of the bullets themselves. Accordingly, Mr. Reporter, near the top of page 529 note this question: 'Just holding this bullet, plaintiff's exhibit G, I now ask you if you are able to say whether or not that bullet was fired from the pistol, plaintiff's exhibit Q, which you now hold in your hand, the answer being: A. I should say it was. Q. You are so able to state? A. Yes sir. Q. Was it fired from that pistol that you hold? A. I say, yes, it was fired from this pistol.' Those questions and answers are stricken out, or rather the answers are stricken out." The record discloses that defendant made no specific motion based upon this ruling of the

court to strike out also the testimony as to exhibit H, nor did he call the court's attention to the omission to strike it out, but throughout all subsequent proceedings the matter was treated as though the testimony to both exhibits G and H had in fact been stricken out. The court had by its rulings stricken out all of this evidence. When it undertook to designate specifically the evidence, by oversight, it failed to note the evidence touching exhibit H. The original ruling, however, covered the matter: the evidence was subsequently treated as eliminated from the case, and no injury could have resulted to defendant.

It is insisted that it was error to admit in evidence two bullets which the expert testified he had fired from the Iver-Johnson pistol, upon the ground that they were not fired "under the same conditions as those existing at the time of the homicide." The objection is untenable. It was shown that the pistol was in the same condition, except as to exterior blood-marks upon the surface when Carr fired the bullets from it, as it was when found in the Weber barn, and it is very apparent that, as tending to fix the identity of the weapon from which the fatal shots were fired, the similarity or dissimilarity of the bullets which Carr fired to those which were found in the body was pertinent and important evidence.

We have thus considered the alleged errors of the rulings of the court in the trial of the cause. Those which have not been specifically noted have not been overlooked. They have been omitted only because they belong to one or another of the classes and kinds of questions of which particular discussion has been had, and a more detailed analysis of them therefore becomes unnecessary.

In the rulings of the court upon the instructions some twenty-eight errors are asserted. It would extend this consideration without profit to set forth all of these instructions at length. It must suffice in most instances to state the result of the examination which has been made of them. First, as to reasonable doubt. Upon this question the court instructed with elaborate fullness and care, avoiding any novel language of its own, and abiding by the definitions well tested and long approved by this court. Certain proposed instructions upon reasonable doubt, as well as upon other subjects, the court refused to give, as having elsewhere been embodied in its

charge. Complaint is made of this in many instances, but the complaint is not well founded. Complaint is also made of the court's action in certain instances in striking out the concluding language of defendant's proposed instruction, that if the jury shall find so and so, they "should find the defendant not guilty," or "should acquit him." It is true that the court did this in certain instances, but in many others it presented the instructions without even this modification. No single individual instance of this would warrant the reversal of a cause otherwise fairly tried. Only by taking the instructions as a whole would a court be enabled to say whether or not the defendant had received fair treatment in this regard, and so reading the instructions in this case the conclusion is irresistible that the jury was fairly and impartially charged.

The court had instructed the jury that if they should, from a consideration of all the evidence in the case, be satisfied of the defendant's guilt beyond a reasonable doubt, it would be their duty to find him guilty. It also instructed the jury that the evidence of defendant's guilt was circumstantial, and that each material circumstance must be proven to their satisfaction, beyond a reasonable doubt, or they should acquit. It is urged that these instructions are in conflict, the one nullifying the other. But this conflict and nullification we are unable to perceive.

The court instructed the jury: "The defendant's plea on this trial is 'not guilty.' Upon that plea a presumption of his innocence arises. That presumption accompanies him throughout the trial. It goes with you in your retirement to consider your verdict. It will avail to acquit the defendant, unless it be overcome by sufficient proof of guilt. You must examine the evidence by the light of that presumption." This instruction was proposed by the defendant and was given by the court. The complaint is made that the court in giving it modified it by striking out an accompanying statement to the effect that unless upon their examination they found the evidence sufficiently strong to overcome the presumption of innocence, and to satisfy the jury of defendant's guilt beyond all reasonable doubt, he was entitled to an acquittal at their hands. The portion stricken out was unobjectionable, and might well have been given, but the substance had been given

so frequently in other instructions that it was no abuse of the discretion of the court to refuse to give it upon the ground that it was mere repetition. In this regard it is to be noted that the court had already specifically charged the jury that unless they "are satisfied from all of the evidence in the case, beyond a reasonable doubt, that the presumption of innocence of the defendant which the law gives him is overthrown, it is their duty to render a verdict of not guilty."

The court's modification of instruction No. 7 was not objectionable. It would have been justified in refusing to give the instruction as a whole. Instead of so doing, it eliminated certain portions of the instruction as being argumentative, and other portions as having already been covered by the charge, and gave the remainder.

It was not error to refuse to give an instruction to the effect that the evidence of certain named witnesses had been stricken out, and, therefore, must not be considered. The court had given an instruction covering this matter as to the testimony of all witnesses which had been stricken out. The naming of these particular witnesses could but have served to confuse the jury, since from the list were omitted the names of other witnesses whose testimony was likewise stricken out.

The court refused to give an instruction as follows: "I instruct you that the mere possession of any article, whether it can or cannot be used in the perpetration of crime, is not of itself sufficient to convict the defendant, but is merely a circumstance, which may or may not tend to prove the charge against the defendant." We cannot perceive wherein the refusal to give this instruction was error at all, much less prejudicial error, for, as was said in *People* v. *Buckley*, 143 Cal. 375, 390, [77 Pac. 169], under like circumstances, "It may be that as mere abstract propositions of law they are correct, but as mere abstract propositions of law they apparently bear no direct relation to the particular charge contained in the information." The defendant, it was shown, possessed numerous articles. Some of these, like the clothing which he wore, were not used in the perpetration of any crime. The common knowledge of the jurors would tell them that as to any article the mere possession is insufficient to convict. If the defendant had a desire to have specific instruction to the effect that mere proof of ownership of the pistol, even if

it were shown that the fatal shots were fired from the pistol, was not in and of itself alone sufficient evidence to warrant a conviction, he should have requested such an instruction. But the instruction as proposed, going to the possession of "any article, whether it can or cannot be used in the perpetration of a crime" was of academic significance merely.

Defendant asked that the jury be told that he was entitled to the independent judgment of every juryman. The court gave the instruction, modifying it so as to read that "each side is entitled to the independent judgment," etc. This assuredly was not error.

The court, at the request of the prosecution, instructed the jury that "An *alibi* simply means that the accused was at another place at the time of the commission of the crime, and, therefore, could not have committed it." It is not contended that this instruction is erroneous in point of law, but it is urged that the court should have instructed the jury more fully upon the subject. But had the counsel for the defendant so desired, it was their duty to have requested such instruction. (*People* v. *McNutt*, 93 Cal. 658, [29 Pac. 243]; *People* v. *Oliveria*, 127 Cal. 381, [59 Pac. 772]; *People* v. *Balkwell*, 143 Cal. 264, [76 Pac. 1017].)

Upon his motion for a new trial defendant urged two propositions: First, that at the preliminary examination the prosecuting attorney advanced the theory that Mary Weber and Bertha Weber were shot, then burned, and their bodies then dragged into the front room, where they were found; that nothing occurred upon the trial of the cause, nor in the opening argument of the prosecution before the jury, to lead defendant to believe that this theory had in any wise been changed or abandoned; that only upon the final argument of the attorney-general was it disclosed that the people were contending that Mary Weber and Bertha Weber were shot in the room where the bodies were found, and their clothes were there saturated with some inflammable liquid and ignited. The contention of appellant is that this conduct upon the part of the prosecution was unfair, and, moreover, that the theory advanced by the attorney-general came at so late a time as to preclude the defense from offering evidence to countervail against it. But to this it must be answered that no deception was practiced by the prosecution; that it was

not incumbent upon the prosecution to offer any particular theory as to the manner in which the crime was committed, and that, upon the other hand, it was perfectly proper to argue that the crime was committed in any manner which the evidence showed reasonably possible. Furthermore, as to the nature of the circumstantial evidence the defendant was advised. It is not made to appear by the affidavits that upon a new trial any new evidence would have successfully controverted the attorney-general's theory.

But the point upon which principal stress is laid is that a new trial should have been granted because of newly discovered evidence impeaching the testimony of the witness Henry Carr. Carr, it will be remembered, had testified that he had sold this particular revolver, Iver-Johnson old style No. 19,554. Upon cross-examination he testified that he remembered it and identified it because it was a peculiar make, and that it was the only one of that make that he had ever owned since he had been in business. J. G. Applegate makes affidavit, giving his place of residence and occupation; that he was in the company of Edward Harrington on the 29th of July, 1904, (which is the month Carr fixes as the month of the purchase of the pistol by defendant); that they visited Henry Carr's place of business, and Harrington there bought, with a lot of cartridges, an 'Iver-Johnson pistol, old style, and that he believes Harrington has the pistol still in his possession. Edward Harrington makes affidavit, giving his address and occupation, that he did on the 29th of July buy from Henry Carr, at his pawnbroker-shop in San Francisco, an old-style Iver-Johnson pistol. Accepting these affidavits as being absolutely true, they serve to contradict the witness, not upon the principal fact of his testimony, but merely as to one of the reasons which he gave for his identification of the weapon. To that extent, and no more, they serve to discredit the witness. But it cannot be said that the trial court abused its discretion in refusing to reopen the case because of this impeaching testimony.

But of more consequence, however, is the affidavit of one Nathan C. Beard. Beard's affidavit is that he purchased a pistol on a railroad train from a man who was not known to him other than by the name of "the Sailor." That upon the 4th of July, 1904, wishing to celebrate, he took the pistol out

of his valise, and with several companions took it to the beach
and fired it several times. Being surprised at the way it
shot, he examined it carefully to see what make it was, and
found it to be an Iver-Johnson, old model, 32-caliber short,
No. 19,554. "We spoke then of the number and wondered
if that many pistols of that make had been made. When the
testimony of Henry Carr was published in the newspaper I
saw that he swore that he had sold this pistol to Adolph
Weber. After I heard of this I wrote to Weber's attorneys
and told them what I knew of this pistol. I kept this pistol
in my possession until the 30th day of September, 1904, when
I sold it to a man who was employed in a repair shop in
Oakland, California, for a dollar and a half. On the 24th
day of March, 1905, at the request of the attorneys for Weber,
I came to Auburn and  .  .  . there carefully examined
the pistol which had been introduced in evidence in the mur-
der case against Weber. . . . I recognized in this pistol
so marked and shown to me as aforesaid, the pistol which I
bought from the sailor and which I sold to the man in Oakland
on the 30th day of September, 1904." As to this affidavit
the brief of the people states that "if the trial court had been
convinced of the truth of this affidavit, a new trial would have
resulted. More than this, it is probable that if the trial court
had not been fully satisfied that the statements in this affi-
davit were absolutely false, a new trial would have been
granted." Considering that this affidavit was prepared by
counsel eminent in the law on behalf of a client convicted
of the most horrible crime of matricide, it is certain that the
affidavit contains everything pertinent to the case which the
affiant was willing to have appear. Yet, this affidavit is open
to grave suspicion as well from the statements which it con-
tains as from the absence of statements which it should
contain. Affiant knows nothing of the sailor from whom he
bought the pistol; he went to the beach with several com-
panions, who were all surprised at the way in which the pistol
shot, yet the name of no one of these companions is given; he
sold it to a man employed in a repair shop in Oakland, but
neither the name of the man nor of the shop is stated. Yet,
while he cannot remember the sailor's name, nor state the
names of his companions, nor the name of the man to whom
he sold the pistol, nor the shop in which he worked, he is not

only able to remember that the pistol in question was an Iver-
Johnson, old model, 32 caliber short, but that its number
was 19,554. He can remember also the very day of the month
—September 30, 1904—upon which he sold the pistol. He
swears that he wrote to Weber's attorneys and told them what
he knew. No corroboration even of this is offered by the at-
torney. But a circumstance of even greater suspicion is that
his affidavit failed absolutely to give any evidence of his loca-
tion or whereabouts. It is to be remembered that a wise
discretion is vested in the trial court in determining the
weight to be given to the statements contained in affidavits
upon motion for new trial. This discretion is to be exercised
in determining the diligence shown, the truth of the matters
stated, and the materiality and probability of the effect of
them, if believed to be true. Moreover, it is to be remembered
that a trial court is justified in regarding with distrust affi-
davits of newly discovered evidence in motions for new trial.
(*People* v. *Howard,* 4 Cal. 547, [16 Pac. 394]; *People* v.
*Sutton,* 73 Cal. 243, [15 Pac. 86]; *People* v. *Freeman,* 92 Cal.
359, [28 Pac. 261]; *People* v. *Gonzales,* 143 Cal. 605, [77
Pac. 448]; *Oberlander* v. *Fixen,* 129 Cal. 690, [62 Pac. 254];
*People* v. *Rushing,* 130 Cal. 449, [80 Am. St. Rep. 141, 62
Pac. 742]; *People* v. *Warren,* 130 Cal. 683, [63 Pac. 86];
*People* v. *Buckley,* 143 Cal. 375, [77 Pac. 169]; *People* v.
*Sing Yow,* 145 Cal. 1, [78 Pac. 235].) Potent as this affidavit
might have been, if believed, it may not be said that the trial
court did not exercise a sound discretion in discrediting it,
and so in denying the motion in support of which it was
brought forward.

We have thus disposed of all the legal questions which in
our view demand detailed consideration. That the verdict
was the result of passion and prejudice upon the part of the
jury cannot be affirmed from the record before us. The
community in which the defendant and his family resided was
doubtless shocked at the atrocity of the crime, and was doubt-
less intensely interested in the arrest and conviction of the
perpetrator. But when the hand of the law fell upon the
son as the criminal, the very horror of the charge must have
caused a suspension of judgment in the mind of every right-
thinking person. It was almost unbelievable that a son and
brother could have done so foul a deed, and that the trial

was had in such a condition of arrested public judgment seems to be borne out by the fact that defendant scarcely exhausted one half of the peremptory challenges allowed him by law before obtaining a jury of his fellow-citizens before whom he was put upon his trial. There is for this court naught to do but to affirm the judgment and order appealed from, and it is so ordered.

Cooper, J., Angelotti, J., Sloss, J., Shaw, J., and Lorigan, J., concurred.

NOTE.—Justice McFarland being unable to act, Justice Cooper, one of the justices of the district court of appeal for the first appellate district, participates herein *pro tempore*, pursuant to section 4 of article VI of the constitution.

BEATTY, C. J., dissenting.—The murder of the Weber family was one of those atrocious crimes which always arouse an intense desire to discover the perpetrator and bring him to justice. Such a state of feeling pervading a whole community increases the danger that one upon whom suspicion first happens to fall may be convicted upon evidence which in cases of less aggravated character would not be deemed thoroughly satisfactory proof of guilt. This fact makes it peculiarly the duty of the courts in such a case to enforce with scrupulous care every right which the law accords to persons accused of crime—rights accorded not for the purpose of screening the guilty—though capable at times of being perverted to that end—but solely in order to guard, as far as may be consistent with the practical administration of justice, against the danger of convicting the innocent. I cannot persuade myself that on the trial this defendant's rights were duly preserved.

The evidence against him was wholly circumstantial, and aside from the testimony of the witness Henry Carr (who swore that during the month of August preceding the murder he had sold to the defendant at his shop in San Francisco the identical pistol which was found in the Weber barn twelve days after the murder) was utterly inconclusive. It showed, it is true, that the defendant had an opportunity to commit the murders and set fire to the house before he left the prem-

ises at about 6:30 P. M. on November 10th. But it showed also that there was ample time for some other person to have entered the house, to have committed the murders and kindled the fire between the time of his departure and the first signs of the fire. It showed also that he had a possible motive for the murder of the whole family in his supposed desire to succeed to his father's whole estate, and there was proof of one or two circumstances justifying a suspicion of his guilt. But altogether this evidence was insufficient to make out the case against him beyond a reasonable doubt. With the addition of Carr's testimony, however, if true, the proof was complete. The only defense, therefore, which he could make was to meet the testimony of Carr either by direct rebuttal or by impeachment of his character. Deprived of a fair opportunity to do this, he was in effect deprived of his whole defense. In view of the capital importance of this item of evidence, I think the interests of justice demanded that he should have been given the fullest and fairest opportunity to meet it. He was, on the contrary, studiously and purposely deprived of such opportunity. Extraordinary precautions were taken prior to the trial to keep from him all knowledge of this witness and of the testimony he was expected to give, and in opening the case, in a speech an hour and a quarter in length, counsel for the prosecution made no allusion to this essential link in their chain of evidence, so that the first knowledge the defendant had of the name or existence of Henry Carr, or of his residence or business, was derived from his testimony as a witness in the midst of the trial. This course of procedure is justified upon the ground that there is no law which obliges the prosecution in a criminal case to make an opening statement to the jury, or, if one is made, to disclose any more of the case than they deem sufficient. It is true that there is no violation of the letter of any law in concealing from the prisoner and his counsel the name and the expected testimony of a witness who has not testified before a grand jury, but there is a violation of the spirit and policy of our law which has always required the names of all witnesses examined before a grand jury to be indorsed upon the indictment, and which since prosecutions by information have been authorized requires the testimony produced before the committing magistrate to be reduced to writing and filed as a public record. The

policy of these laws is evident, and they are in the interests of justice. It does not accord with our ideas of justice, and has no tendency to promote its ends, to keep the most important witness against a prisoner in ambush until the moment when he is called upon to make his defense. If a witness that is to be called to support a criminal charge bears a good reputation, and can be depended on to tell the truth when placed upon the stand, there is no occasion to keep him in hiding, and if, on the other hand, he is a person of doubtful antecedents, engaged in unlawful business in an unsavory locality, there is all the more reason that the accused should not be deprived of any legitimate means of exhibiting him in his true character before the jury which is to weigh his testimony.

The argument upon which the course of the prosecution in this particular is defended is in substance this: We knew that the defendant was guilty, and if he had been informed of what we expected to prove by Henry Carr, he was capable of resorting to any illegitimate means of preventing or rebutting his testimony, which means, I suppose, that he would have suborned him to keep away from the trial, or would have suborned witnesses to impeach or contradict him. This is an argument which begs the whole question which it is the sole purpose of a trial to determine; the question, that is to say, whether the defendant is guilty. It assumes his guilt in advance as a justification for depriving him of a fair opportunity to show that the evidence against him is false or untrustworthy, and it ignores the fundamental principle upon which our entire system of criminal procedure is based,—viz. that the defendant in every criminal action is presumed to be innocent until he is proved to be guilty.

But, after all, it cannot be said that in the matters so far considered there is any ground for reversing the judgment and order of the superior court. The prosecution did not transgress the letter of any law, and there was no ruling of the court in this connection which can be pronounced erroneous. The preceding discussion, however, will be seen to have a material bearing upon an erroneous ruling made during the cross-examination of a witness called to sustain the reputation of Henry Carr at a later stage of the proceedings.

The cross-examination of Henry Carr showed that he kept a second-hand store on Dupont Street, San Francisco, between

CXLIX Cal.—23

Pine and California; that under the pretext of buying articles and agreeing to sell them back to the vendor at an advance, he was really doing a pawnbroker's business without a license; that among other articles in which he dealt were blackjacks and brass knuckles. Several witnesses, including a former police judge and officers of the police, testified that his reputation for truth, honesty, and integrity was bad, and that they would not believe him under oath. The defendant also offered to prove by a certified copy of the proceedings of the police commissioners of San Francisco that the license of the defendant to deal in second-hand goods had been revoked after a hearing of charges of receiving stolen goods and soliciting a thief to steal. This evidence was excluded on an objection by the prosecution. The objection, of course, was valid upon technical grounds, but there is no doubt that the evidence of the police commissioners themselves, if they had been placed upon the stand, would have been admissible as to his reputation. The defense also offered to prove by a certified copy of a San Francisco ordinance that the selling or keeping for sale of blackjacks and brass knuckles (the weapons of thugs and assassins) was a misdemeanor. This evidence was also excluded on objection by the prosecution, and the ruling was erroneous. The offer was not to prove specific instances of misconduct on the part of Carr, which would have been inadmissible, but only to show that the business which he had admitted that he was carrying on both by his direct and cross-examination was a contraband and disreputable business. It was clearly competent and relevant to the question of his character.

A more important error was committed by the court in ruling upon an objection to a question asked the witness Abrahams, who had testified to the good reputation of Carr.

The cross-examination of this witness developed the fact that his favorable testimony was based solely upon reports that Carr was in the habit of making prompt payments to the wholesale dealers who supplied him with goods.

The following questions, answers, rulings, and exceptions then ensued:

"Q. Have you ever heard discussed the fact as to what business he carried on?

"A. No sir.

"Q. Have you ever been told that his license to carry on business has been revoked?

"A. I am not aware of that fact.

"Q. Have you ever been told that he had a lengthy examination before the board of police commissioners and that his license was revoked?

"The prosecution objected to the question as being wholly irrelevant, immaterial, and incompetent.

"*The Court:* The court is certainly of the opinion that the questions are asked for the purpose of the question, not the answers. I don't think you can change the mind of the court upon it. These matters the court ruled out as being grossly immaterial, and the court cannot help but hold and rule that they are asked for the purpose of questions and not the answers, and the court must sustain the objection.

"The defendant excepted to the remarks of the court and to the ruling of the court."

This ruling was clearly erroneous, and the error was aggravated by the unmerited rebuke administered to counsel in sustaining the objection. I entirely dissent from the view of this question taken in the opinion of the court. The witness had not answered the first question asked him, in what is conceded to have been a proper line of cross-examination. He had evaded it. He was not asked whether he *knew* that Carr's license had been revoked, but whether he had heard the matter discussed. His answer that he was not aware of the fact might have been literally true, although he had heard the matter discussed. Counsel then, as he had a perfect right to do, asked him the same question in a more specific form, and had a right to an answer.

It is a peculiarity of the rule of evidence relating to the impeachment of witnesses that you cannot prove by direct evidence specific instances of improper or criminal conduct for the purpose of discrediting them, but if a witness is called to rebut evidence of bad reputation, he may be asked on cross-examination if he has not heard of such specific instances of misconduct. The cases cited in the opinion of the court sustain this proposition, and it is sustained by abundant authority elsewhere. The first branch of the rule was invoked successfully against the defendant when he offered to prove by the record of the board of police commissioners that they had

revoked Carr's license after an investigation of charges of receiving stolen goods, etc. But when he endeavored in a perfectly legitimate manner to avail himself of the other branch of the rule—not only was his right to do so denied him, but his counsel was censured by the court in the presence of the jury, in language clearly implying that he was seeking in bad faith to get before the jury matters which they were forbidden to consider. Suppose that, instead of sustaining the objection of the district attorney, with a plain intimation that nothing more would be heard from the defense, the court had overruled the objection and compelled the witness to give direct answer to the question, and suppose, as is not improbable, that he had admitted having heard of the action of the police commissioners—of what value would the testimony of this witness have been? Instead of rebutting he would have confirmed the evidence offered on the part of the defense.

It may be said that this was a small matter not of sufficient importance to justify an order for a new trial—but in my estimation it was not a small matter. Carr was the most important witness for the state, and if it can be supposed that uncontradicted proof of his bad reputation for honesty and integrity would have induced one or more jurors to reject his testimony the defendant would not have been convicted of a most horrible and unnatural crime, and sentenced to an ignominious death. Evidently the prosecution did not consider it a trifling matter, and neither they nor the court had any reason to suppose the question was asked in bad faith. If they expected it to be answered in the negative, the answer could have been given in far less time than it took to interpose the objection, and that would have ended the matter to their advantage.

There are other minor errors disclosed by the record which I do not care to discuss. It is enough to say that the defendant was denied his substantial rights in respect to the testimony of a witness of doubtful reputation, upon the vital point in the case.

For these errors the judgment and order of the superior court should be reversed.

Rehearing denied.