[Crim. No. 1123. Fourth Dist. Oct. 23, 1956.]

THE PEOPLE, Respondent, v. RICHARD GEORGE WANG et al., Appellants.

Thomas M. Eckhardt for Appellants.

Edmund G. Brown, Attorney General, William E. James, Deputy Attorney General, Lowell E. Lathrop, District Attorney (San Bernardino) and J. Steve Williams, Chief Deputy District Attorney, for Respondent.

BARNARD, P. J.—The defendants were charged with robbery, it being charged that on August 7, 1955, they took $526 from one Mimms. In a second count they were charged with assault by means of force likely to produce great bodily injury, alleging an assault on Mimms on the same day. A jury found them guilty of robbery in the first degree on the first count, and guilty as charged in Count II. A motion for new trial was denied and they were sentenced to imprisonment, the sentences on Count II to run concurrently with those imposed as to Count I. They have appealed from the judgments and from the orders denying their motions for a new trial.

It appears that the defendants stayed at a café and motel at Searchlight, Nevada, known as the El Rey Club, from August 5 to August 7, 1955, having registered under the name of Wayne. Mr. Mimms, a prospector and dealer in used automobiles, was in a bar at the El Rey Club during the evening of August 7. While he was discussing mining with another patron, Mrs. Wang joined in the conversation. A little later she and Mr. Wang had a conversation with Mimms about mining, during which she showed Mimms a "hunk of tungsten" in which he expressed great interest. About 9 o'clock that evening they left the El Rey and got into the Wangs' car. Mr. Wang was driving, Mrs. Wang sat on the right-hand side, and Mimms sat in the middle. Mrs. Wang

testified that she had on a bathing suit, a white beach jacket, and that she did not think she was wearing any shoes.

Mr. Mimms testified that the next thing he remembered after getting in the car with the Wangs was coming-to on the desert at about 5 o'clock the next morning. He was then seriously injured and his money was gone. When he recovered consciousness he crawled to the edge of United States Highway 66, where he was picked up by a passerby. This passerby testified that Mimms was in a "very bad condition" and had blood all over him; that he asked Mimms if he had been hit by a car and Mimms replied "No," that a man and woman had beaten him up and robbed him of over $500. The passerby took him to a hospital in Needles.

The point where Mimms was picked up was approximately 7 or 8 miles west of Needles, 50 miles from Searchlight, and a mile or so east of the point where the road from Searchlight joins Highway 66. Officers who went to the scene early that morning found a blood-stained depression in the sand 161 feet from the highway, where the assault had apparently taken place. Near the depression there were "scuffle marks," and a good sized rock which is largely covered by bloodstains. Some blood was found on nearby twigs, there were spatters of blood on a paper found in a bush at the scene, and blood on a pink kleenex, which was of the same fabrication and color as that of a box of kleenex found in the car of the defendants at the time of their arrest. All of this blood was human blood of the same type as that of Mimms. There were tire marks near the highway where a vehicle had driven in and backed out again, apparently for the purpose of turning around. There were three sets of footprints going from the highway to the depression, and two sets of footprints returning to the highway, one of them a set of bare footprints. The soil was such that plaster casts could not be taken of the footprints.

A doctor who examined Mimms at the hospital, testified that he was in a state of severe shock and partially conscious; that he had been brutally injured on the left side and front of his head, including the left eye; that both upper and lower jaws were fractured and the bones around the left eye were also broken; and that two of his teeth were gone and the gums brutally lacerated. The doctor also testified that in his opinion two instruments had been used in inflicting the wounds on the victim, one a heavy blunt instrument of some kind and the other could have been a bullet since he found a

round wound of entrance on the left side of the skull with the point of exit some three inches away, which he thought could have been caused by a .22 bullet.

The defendants were arrested on the afternoon of August 8, in Ontario where they were living in a trailer. Their automobile had just been washed and the rubber floor mat in front had just been washed and a portion was still wet. The seat covers on the front seat had been torn off, leaving shreds of fabric around the fastenings. A .22 rifle was found in the car, and a .25 automatic pistol was found at the head of their bed in the trailer. Cartridges for the pistol and the rifle were also found. Mr. Wang testified that he did not remember whether or not he had this pistol with him on the trip to Searchlight. The white jacket which Mrs. Wang had been wearing and the khaki shorts which Mr. Wang had been wearing when they left the El Rey Club had been washed and were still wet. When he was arrested Mr. Wang told the officers that he had been wearing blue shorts that night, but it was later established that he had been wearing khaki shorts. When an officer asked him why he had removed the seat covers he said that "they had gotten dirty." An expert witness testified that he found traces on the white jacket and khaki shorts which indicated that they had been contaminated with blood, but the blood had been removed to the point where no other tests were available. He also found spots on the washed rubber floor mat which he identified as human blood. Mr. Wang's right hand was swollen and pictures of it were introduced into evidence. He testified that he had fallen and injured his hand on August 6, but a dealer in the El Rey Club testified that she observed nothing unusual about his hand when he was playing 21 on Sunday evening. The defendants did not check out from their motel room at the El Rey, and they had mailed the key to the room and payment therefor on the morning of August 8.

While in the bar at Searchlight Mimms had displayed considerable money, talked of his recent good luck in Las Vegas, and had been buying drinks for others very freely. There was evidence that just before these parties left the El Rey that night the defendants offered to show Mimms their claim near Needles where they said the tungsten which Mrs. Wang had shown him had come from, and he expressed a desire to see where it came from. Mrs. Wang testified she could not remember whether her husband talked about owning a claim. Mr. Wang testified that they left Searchlight about 9 p. m.;

that they had been talking to Mimms, and it was about time for them to eat; that Mimms said he would buy their dinners if they would go to Needles with him, and that he knew a good place to eat in Needles; that he asked Mimms "Why go that far? (about 40 miles). We have a good place to eat right here;" that Mimms insisted and they agreed to go to Needles; that they went out and got in the car; that he backed out or drove out onto the highway and "we no more than got started when Mimms opened the right door"; that Mrs. Wang shut the door and Mimms repeatedly opened it so he drove slowly and then stopped; that before he got fully stopped Mimms got out and started walking back to the El Rey Club; that he called to Mimms to wait but Mimms, who was walking fast, waved and said "Go on," so they "went right straight home"; that they had not checked out and he had forgotten to pay and had the key with him; that the next morning he mailed the key and pay for the room to the motel; that when they reached Highway 66 they turned west and went to Amboy, and then turned south and went through Twentynine Palms; that they stopped to rest between Amboy and Twenty-nine Palms, "It is quite a winding road there, not too easy to drive"; that they got home about 2:30 a. m., unloaded part of their things, and then went to bed; that about 10:30 the next morning he washed the car and tore off the seat covers which were on the back of the front seat; that he then burned the seat covers; that he could not explain what appeared to be blood on the right-hand side of the floor mat, but explained that his shorts and the white jacket had been washed with a handkerchief on which he had gotten some blood from a blood blister on his hand; that when they left Searchlight none of them was intoxicated; and that when they left to go to Needles to eat dinner he planned to return to the motel. Mrs. Wang testified largely to the same effect. There were some discrepancies between her testimony and that of her husband, and some discrepancies between their statements to the officers and their testimony at the trial.

Appellants' main contention is that the evidence is insufficient to support the verdict. It is argued that in view of the evidence it is physically impossible that they could have committed this assault on Mr. Mimms. It is argued that the doctor who treated Mimms on the early morning of the 8th testified that he tied up the arteries on his face that were bleeding, that there had been a considerable amount of blood and "everything was a massive blood clot," and that the

injuries to the victim's face must have resulted from a number of blows; that since it thus appears that the victim must have bled profusely, that blood must have splattered over a considerable distance during the succession of blows with a heavy rock; that this is confirmed by the fact that blood was found on twigs and on the paper in the bush near the depression; that an expert witness testified as to the difficulty in removing all evidence of blood from hands or clothing in a short time; that if appellants had been present it would have been impossible for them to remove all evidence of blood from their hands, and some residue would have been left on the steering wheel and gearshift knob of their automobile, where none was found; and that it would have been impossible for them to have removed all evidence of blood from their clothing which must have been there if they had been present.

This argument was one for the jury, and it does not necessarily follow that the evidence establishes the physical impossibility relied on. Most of the blood indications found were in the depression referred to, and on the rock that was apparently used. This depression was about the size that would have been made by Mimms' head, and it could reasonably be inferred that most, if not all, of the blows to his head were made while he was lying on the ground and that the depression in the sand resulted from these multiple blows. The rock itself was large enough to afford the assailant considerable protection from any spurting blood. Also, the blood on the twigs and the paper may have gotten there when the victim tried to get up after he became conscious. Moreover, the evidence indicates that there had been some blood on appellants' clothing. If any blood did get on their hands, it may reasonably be inferred that they could be sufficiently and quickly cleaned so that they would leave no "residue" on the steering wheel or other hard surfaces of the car, regardless of whether they could be sufficiently cleaned to have immediately foiled a full scientific examination. The entire question was one of fact for the jury, and the evidence is far from sufficient to establish that the only inference, or the most reasonable inference, to be drawn from the evidence in this connection is the one relied on by the appellants.

At the oral argument the appellants also argued that the evidence showed that the bullets for the .22 rifle were lead bullets and that if that rifle had been used the course of the bullet from the point of entrance to the point of exit would necessarily have shown lead tracings. While the doctor who

examined the victim the next morning testified that from the size of this entrance hole he thought it might have been made by a .22 bullet it is equally possible that it was caused by a .25 caliber bullet, which would make a hole so nearly the same size as not to be easily distinguished. There was evidence that the .25 caliber pistol found in appellants' trailer had in it copper-jacketed bullets, and that such a bullet would not leave lead tracings. Moreover, the expert testified that a lead bullet will not leave tracings ''if it passes through soft tissue parts''; that there was about a quarter of an inch of soft tissue between the bone and outer surface of the scalp where this bullet went through; and that there was no evidence here that ''a bullet had at any time impinged itself upon the bone.''

The contention that it is physically impossible that the appellants could have committed this assault cannot be sustained, and the evidence is otherwise sufficient. In addition to the other circumstances pointing to their guilt, portions of the story told by the appellants would naturally have an adverse effect upon its credibility, and some of the explanations given were far from satisfactory. The jury could well question the quick washing of certain articles, including the floor mat of the car, and the explanation for the sudden decision to remove and burn the seat covers does not seem plausible in view of all of the evidence. The victim was an elderly man interested in mining, and it would seem more probable that he would be interested in going to see a claim producing this tungsten ore than in going some 40 miles to eat at that time of night. If, as appellants stated, they were reluctant to go to Needles and wanted to eat where they were it seems peculiar that when Mimms got out of the car, almost as soon as he entered it, they would not have gone back to the El Rey to eat. This is especially true since Mr. Wang testified that it was ''time to eat'' when the trip to Needles was first mentioned and that when they left for Needles they intended to return to the El Rey. If they changed their minds and decided to go on home, while still at or near Searchlight, it would strain anyone's credulity to accept their explanation that they gave no thought to such a thing as the advisability of checking out and paying their bill. The same may be said of the reason given by Mr. Wang for registering at the El Rey Club under a different name. It also seems unusual that the appellants, after they were on Highway 66, would have turned off at Amboy and gone over a winding road

through the foothills which was ''not too easy to drive,'' thus leaving the main highway to San Bernardino and points west of there. The appellants also testified that Mimms, when he got out of their car, was worried about having left his own car and the things he had in it. That he would again leave later that night, with another man and woman, seems improbable. While the evidence is circumstantial it is sufficient, with the inferences that the jury could reasonably draw from it, to support the verdict. (*People* v. *Newland,* 15 Cal. 2d 678 [104 P.2d 778] ; *People* v. *Green,* 13 Cal.2d 37 [87 P.2d 821] ; *People* v. *Kittrelle,* 102 Cal.App.2d 149 [227 P.2d 38].)

The only other point raised is that the court erred in removing Mr. Wang's discharge certificate from the army and his service record from evidence, and instructing the jury to disregard them. It is argued that these were offered for the purpose of proving the reputation of Mr. Wang, and that they were admissible as uniform business records under sections 1953e and 1953f of the Code of Civil Procedure.

The court first admitted these papers in evidence and later reversed its ruling and instructed the jury to disregard them. When the documents were first offered in evidence the district attorney offered, in the presence of the jury, to stipulate that Mr. Wang's separation from service was an honorable discharge, expressing the opinion that this was the only legitimate purpose of going into the matter at that time. When the court reversed its ruling and told the jury to disregard this evidence appellants' counsel stated ''If you wish me to do so, I will be happy to withdraw them.'' Ordinarily, character witnesses called by the defense may testify only to general reputation as limited to the neighborhood where the accused resides. Whether or not these papers (the certificate of honorable discharge is particularly relied on) should have remained in evidence, it would be unreasonable to hold that they could have affected the verdict, and no possible prejudice appears. (*People* v. *Houser,* 85 Cal.App.2d 686 [193 P.2d 937].)

The judgments and orders are affirmed.

Griffin, J., concurred.